Joan BUCHET, Bert Mason
and all others similarly
situated, Plaintiffs,

v.

ITT CONSUMER FINANCIAL CORPO-
RATION, a Delaware corporation;
Thorp Credit and Thrift, a Minnesota
corporation; Aetna Finance, a Wiscon-
sin corporation; and ITT Financial Cor-
poration, a Delaware corporation, De-
fendants.

No. 3–91 CIV 809.

United States District Court,
D. Minnesota.

Feb. 24, 1994.

Chestnut & Brooks, P.A. by Karl L. Cambronne, and Sandra J. McGoldrick–Kendall, Minneapolis, MN, and Reinhardt and Anderson by Mark Reinhardt, and Sara Madsen, St. Paul, MN, appeared on behalf of the plaintiff class.

Dorsey & Whitney by Janice M. Symchych, and Carol A. Peterson, Minneapolis, MN, appeared on behalf of the defendants.

Law Offices of the Legal Aid Soc. of Minneapolis, Inc. by Galen Robinson, and Timothy L. Thompson, Minneapolis, MN, appeared on behalf of objecting class member/proposed intervenor Joyce Blesi.

Legal Services of Northeastern Wisconsin, Inc. by Daniel A. Idzikowski, Sheboygan, WI, appeared on behalf of objecting class member/proposed intervenor Mark Grennier.

## ORDER

ALSOP, Senior District Judge.

This matter came before the Court on November 23, 1993, on the joint motion of class counsel and the defendants for final approval of the Amended Settlement Agreement. Class members Joyce Blesi and Mark Grennier appeared through counsel and objected to the proposed settlement.[1] Blesi and Grennier also move to intervene in this action for the limited purposes of appeal and participation in any further settlement discussions. For the reasons set forth in this opinion, the Court will deny the motion to approve the Amended Settlement Agreement and grant Blesi and Grennier's motions for limited intervention.

## I. BACKGROUND

The defendants in this action (collectively, "ITT") are a group of closely related corporations that previously operated a nationwide consumer loan business. Each of the named plaintiffs obtained consumer loans through ITT. The plaintiffs allege that ITT engaged in the illegal and fraudulent practice of deferring monthly loan payments without the knowledge or consent of the borrower. The plaintiffs further allege that ITT carried out this practice by forging borrowers' signatures on documents purportedly authorizing loan deferrals and concealing the deferrals from the borrowers.

1. Other class members have also objected by letter or telephone call to the Court and counsel.

In their First Amended Complaint,[2] the plaintiffs set forth twenty causes of action against ITT, including RICO claims, federal Truth–In–Lending Act violations, and various state law statutory and common law claims. The plaintiffs also set forth class allegations, seeking to represent all persons in Minnesota, Wisconsin, and Illinois, who obtained consumer loans from ITT and whose loans were deferred.

This matter previously came before the Court on a joint motion by the plaintiffs and ITT for preliminary approval of a proposed settlement. The Settlement Agreement originally submitted to the Court contemplated that the plaintiffs would file a Second Amended Complaint to include Joan Buchet as a named plaintiff and class representative. The Settlement Agreement also proposed that the class allegations be expanded and that the following nation-wide classes be certified solely for the purpose of settlement:

(1) Class one is defined as all persons who have obtained one or more loans from ITT and in connection therewith had an accrued deferral of one or more monthly payments during the period from January 1, 1987 through February 28, 1993. An "accrued deferral" is a one-month extension of a loan installment or contract term for which a charge is assessed at the time the extension is granted, but collection of the charge is delayed.

(2) Class two is defined as all persons who have obtained one or more loans from ITT and in connection therewith had a non-cash deferral of one or more monthly payments during the period from January 1, 1987 through February 28, 1993. A "non-cash deferral" is a one-month extension of a loan installment or contract term for which a charge is not assessed.

In return for a nation-wide settlement of all claims arising out of or in any way relating to consumer loans, ITT proposed to issue scrip to the class members in the form of certificates, which entitled the class members to purchase non-credit life ("SPT–5") insurance policies or annual Thrift Club memberships at reduced prices or to have reduced payments on "new loans," as defined by the Settlement Agreement. Under the terms of the Settlement Agreement, each class member was entitled to one certificate for each deferral. The certificates were fully transferrable and expired three years after they became effective. The Settlement Agreement also proposed that ITT would pay the named plaintiffs, Buchet, Mason, and Livingston, $5,000 each. Finally, the Settlement Agreement proposed to pay plaintiffs' counsel $26 million for costs, disbursements, expert witness fees, and attorneys' fees. These costs and attorneys' fees were to be paid in cash.

By order dated April 20, 1993, the Court granted preliminary approval of the Settlement Agreement; provisionally certified the classes as set forth in the Settlement Agreement; approved, as to form and content, the class notice; and scheduled a final approval hearing. In that order, the Court noted that the plaintiffs face significant challenges in seeking compensation for their alleged injuries, including class certification, standing under RICO, and proof of the requisite elements of the various state law claims. (4/20/93 Order at 6–7.) The Court further noted that other courts have approved scrip settlements of class actions where the plaintiffs were faced with these types of difficulties. (*Id.* at 7.) However, the Court expressed "its own doubts as to the worth of the scrip to the class." (*Id.* at 8.) The Court's concern was, in part, based upon the extremely low redemption rates of scrip issued as part of a settlement in another class action involving ITT. (*Id.* at 8–9.) Although the Court granted preliminary approval to the Settlement Agreement, it cautioned counsel with the following admonition:

---

**2.** The plaintiffs' First Amended Complaint names Phyllis Livingston and Bert Mason as individual plaintiffs. By order dated June 4, 1992, the Court dismissed Livingston's claims because they were barred by the doctrine of res judicata. *Livingston v. ITT Consumer Fin. Corp.*, 795 F.Supp. 921, 925 (D.Minn.1992). On July 29, 1993, after granting preliminary approval to the proposed settlement, the Court ordered that the caption of this case be amended by substituting Joan Buchet for Phyllis Livingston.

Finally, the Court notes that its preliminary approval of the Settlement Agreement is in no way intended to give the Court's final imprimatur on the Settlement Agreement. Although this Order sets loose a host of mechanisms hurtling toward final settlement of this action, including individual notice to over 400,000 class members, the Court notes that this Order in no way limits this Court's ability to deny final approval of the Settlement Agreement following the final hearing on the matter.

(*Id.* at 9–10.)

Shortly after granting preliminary approval, the Court was informed that defendant ITT Financial Corporation had sold the consumer loan portfolio of its subsidiary, defendant ITT Consumer Financial Corporation, to a group of investors. The closing on this transaction took place on June 3, 1993. Because the Settlement Agreement, as preliminarily approved, involved the redemption of scrip through ITT Consumer Financial Corporation, the Court expressed concern over the effect of the sale on the Settlement Agreement and asked counsel to provide the Court with a basis for the Court's continuing preliminary approval. Counsel informed the Court that ITT Consumer Financial Corporation had contracted with The Associates, another consumer lending company, to take full responsibility for redemption of the scrip certificates. In exchange, ITT Consumer Financial Corporation agreed to compensate The Associates for the value of the redeemed scrip.

The parties then presented the Court with an Amended Settlement Agreement. The Amended Settlement Agreement reflects a variety of technical changes, but essentially sets forth the same substantive scrip settlement as the original Settlement Agreement. By order dated August 16, 1993, the Court granted preliminary approval of the Amended Settlement Agreement.

The Amended Settlement Agreement, which is now before the Court, involves two provisionally-approved classes with a total of 449,433 class members. Under the terms of the proposed settlement, these class members are entitled to 1,888,616 certificates with a face value of $47,215,400. Class counsel and ITT ask this Court for final approval of the Amended Settlement Agreement. Grennier and Blesi, among others, object to the Amended Settlement and seek to intervene.

## II. ANALYSIS

### A. Blesi and Grennier's Motions to Intervene

Blesi and Grennier both argue that they are entitled to intervene as a matter of right under Rule 24(a). Alternatively, they argue that the Court should permit them to intervene under Rule 24(b). Class counsel and ITT oppose the motions.

#### 1. *The Standard for Intervention*

Rule 24(a), which governs intervention as of right, provides that:

[u]pon timely application anyone shall be permitted to intervene in an action ... when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

Fed.R.Civ.P. 24(a). In the Eighth Circuit, this rule requires that one seeking intervention file a timely application, and that the applicant then satisfy a tripartite test; 1) the party must have a recognized interest in the subject matter of the litigation; 2) that interest must be one that might be impaired by the disposition of the litigation; and 3) the interest must not be adequately protected by the existing parties. *Mille Lacs Band of Chippewa Indians v. Minnesota,* 989 F.2d 994, 997 (8th Cir.1993).

#### 2. *Timeliness of the Motions*

Class counsel and ITT argue first that neither Blesi nor Grennier are entitled to intervention because they failed to file a timely motion to intervene. The Eighth Circuit recently set forth the following guide-

lines for determining the timeliness of a motion to intervene:

> Whether a motion to intervene is timely is determined by considering all the circumstances of the case. No ironclad rules govern this determination. In determining timeliness, factors that bear particular consideration are the reason for the proposed intervenor's delay in seeking intervention, how far the litigation has progressed before the motion to intervene is filed, and how much prejudice the delay in seeking intervention may cause to other parties if intervention is allowed.

*Mille Lacs Band of Chippewa Indians*, 989 F.2d at 998 (citations omitted).

Grennier and Blesi brought their motions to intervene in connection with their objections to the Amended Settlement Agreement. Grennier filed his motion to intervene on November 16, 1993. Blesi filed her motion to intervene on November 19, 1993. As class counsel and ITT point out, these motions were brought on the eve of the final approval hearing. However, Grennier and Blesi had no reason to object or intervene until they received notice of the Amended Settlement Agreement. Grennier received notice of the proposed settlement on October 12, 1993, less than six weeks before the final approval hearing.[3] Class counsel admits that "[c]ounsel for plaintiffs and defendants purposefully developed a tight schedule between sending notice and certificates and the date on which the certificates would be activated [upon final approval of the Amended Settlement Agreement]." (Pls.' Mem.Opp'n Interven. of Blesi at 8.) Given this schedule, the Court finds that Grennier and Blesi's motions were not so untimely as to prevent them from participating in this action. Moreover, since the Court is denying final approval, the two provisionally-certified classes will be decertified, and the parties will begin anew, litigating their claims and considering other approaches toward a settlement. Therefore, this lawsuit is still in its early stages.

■ ITT argues that allowing Grennier and Blesi to intervene and participate in future settlement negotiations would result in unnecessary prejudice because "three-cornered negotiations are clumsy at best, especially when one of the corners ... adopts an obdurate negotiation position." (Defs.' Mem. Opp'n Interven. of Blesi at 6) (quoting *Mars Steel Corp. v. Continental Ill. Nat'l Bank and Trust Co.*, 834 F.2d 677, 684 (7th Cir. 1987)). The Eighth Circuit recently responded to a similar argument in the following manner:

> Prejudice that results from the mere fact that a proposed intervenor opposes one's position and may be unwilling to settle always exists when a party with an adverse interest seeks intervention. Any prejudice to the [plaintiff's] ability to settle results not from the fact of the [proposed intervenors'] delay in seeking intervention, but rather from the [proposed intervenors'] presence in the suit. Rule 24(a) protects precisely this ability to intervene in litigation to protect one's interests.

*Mille Lacs Band of Chippewa Indians*, 989 F.2d at 999. Similarly, in this case, the fact that additional parties may make future negotiations more difficult is insufficient to prevent them from joining the action.

### 3. Adequacy of Representation by Class Counsel

■ Class counsel and ITT also argue that neither Grennier nor Blesi are entitled to intervene because they have not demonstrated that their interests are inadequately protected by class counsel. The Eighth Circuit recently set forth the following guidelines for determining the adequacy of representation:

> The "inadequate representation" condition is satisfied if the proposed intervenor shows that the representation of its interests by the current party or parties to the action may be inadequate. The burden for making this showing should be treated as minimal. Doubts regarding the propriety of permitting intervention should be re-

---

**3.** The record does not reflect when Blesi received her notice of the proposed settlement. However, ITT mailed all notices "on or before October 1, 1993." (Defs.' App. to Br.Supp. Final Approval Ex. A, Bixby Aff. ¶ 2.) The record does reflect that Blesi contacted her counsel and requested that he object to the Amended Settlement Agreement on November 4, 1993. (Robinson Supp. Decl. ¶ 9.)

solved in favor of allowing it, because this serves the judicial system's interest in resolving all related controversies in a single action.

*Sierra Club v. Robertson,* 960 F.2d 83, 85–86 (8th Cir.1992) (citations and quotation marks omitted).

Grennier and Blesi have both objected to the Amended Settlement Agreement. They argue that the scrip gives the class insufficient value, that the release is overbroad, and that the notice given to class members was deficient. This position clearly puts them at odds with class counsel, and, therefore, the Court finds that Grennier and Blesi have made the minimal showing necessary to support their motions to intervene.

### 4. *Res Judicata*

■ With respect to Grennier, class counsel and ITT further argue that he has no interest in this action because he previously settled an action brought by ITT to collect on a loan. As part of this settlement, Grennier dismissed with prejudice his counterclaims, which were brought in part under the Wisconsin Consumer Act. Since the allegations in this action could have been brought as a counterclaim in the collection action, class counsel and ITT argue that the doctrine of res judicata bars Grennier from participating in this action. Therefore, the argument continues, this Court has no jurisdictional basis by which to allow him to intervene.

This argument is foreclosed by the Court's previous ruling on ITT's summary judgment motion. In support of that motion, ITT argued that the individual plaintiffs' claims were barred by res judicata because the loans at issue had previously been the subject of litigation. This Court held that:

Ordinarily, actual knowledge of the plaintiff of a potential claim is not a requirement for the application of res judicata. An exception to this general principle exists in cases where fraud, concealment, or misrepresentation have caused the plaintiff to fail to include a claim in a former action.

The conduct forming the basis for plaintiffs' claims in the instant case involves forgery—by definition a self-concealing act. In addition, plaintiffs have introduced evidence that defendants actively concealed their conduct by, among other things, making false records entries and destroying customer copies of the deferrals. Accordingly, plaintiffs' claims are not barred by res judicata unless plaintiffs knew of the existence of their claims prior to conclusion of their previous litigation with the defendant.

*Livingston v. ITT Consumer Financial Corp.,* 795 F.Supp. 921, 924 (D.Minn.1992) (citations omitted). Neither class counsel nor ITT has introduced any evidence suggesting that Grennier or his attorney was aware of a potential claim based upon the scheme of forged deferrals alleged in this action. Therefore, res judicata does not bar Grennier from participating in this litigation.

### 5. *Scope of the Intervention*

■ Grennier seeks to intervene for the limited purpose of preserving his right to appeal any settlement approved by this Court. Class counsel and ITT admit that intervention is a condition of appeal from the approval of a class action settlement. *See Croyden Assocs. v. Alleco, Inc.,* 969 F.2d 675, 680 (8th Cir.1992), *cert. denied,* — U.S. —, 113 S.Ct. 1251, 122 L.Ed.2d 650 (1993). Therefore, Grennier's request will be granted. *See White v. National Football League,* 822 F.Supp. 1389, 1432 (D.Minn.1993) (permitting objectors to intervene "solely for purposes of preserving their rights to appeal any judgment entered by the court").

■ Blesi's motion to intervene is captioned "Motion to Intervene for the Limited Purpose of Objecting to the Settlement, Participating in Future Settlement Hearings and as a Condition of Appeal." At oral argument on these motions, Blesi's counsel indicated that he was also seeking to "participat[e] in further settlement hearings." (Tr. 11/23/93 Hr'g at 62.) The Court has already permitted Blesi to file and argue objections to the Amended Settlement Agreement. Blesi will also be allowed to intervene to preserve her

right to appeal[4] and to participate in future settlement negotiations. The Court will not require class counsel or ITT to respond to Grennier or Blesi's complaints in intervention, which have already been filed. *Cf. White*, 822 F.Supp. at 1432 n. 72 (allowing intervention for purposes of appeal but not permitting filing of complaints in intervention).

## B. Final Approval of the Amended Settlement Agreement

### 1. *The Standard for Approval of Class Action Settlements*

■ Rule 23(e) requires judicial approval of class action settlements. In assessing whether the proposed settlement protects the interests of absent class members, the Court must determine whether the proposed settlement is fair, adequate, and reasonable. *Van Horn v. Trickey*, 840 F.2d 604, 606 (8th Cir.1988); *In re Flight Trans. Corp. Sec. Litig.*, 730 F.2d 1128, 1135 (8th Cir.1984), *cert. denied*, 469 U.S. 1207, 105 S.Ct. 1169, 84 L.Ed.2d 320 (1985). In making this determination, the Court should consider the following factors: "the merits of the plaintiff's case, weighted against the terms of the settlement; the defendant's financial condition; the complexity and expense of further litigation; and the amount of opposition to the settlement." *Van Horn*, 840 F.2d at 607.

■ "The single most important factor in determining whether a settlement is fair, reasonable, and adequate is a balancing of the strength of the plaintiff's case against the terms of the settlement." *Id.* In a case, such as this one, where class certification has been deferred to the settlement stage, a heightened level of scrutiny is required, and the Court's inquiry should be "especially careful and penetrating." *Mars Steel Corp. v. Continental Ill. Nat'l Bank and Trust Co. of Chicago*, 834 F.2d 677, 681–82 (7th Cir.

1987). Finally, the Court is not free to rewrite the terms of the proposed settlement. Instead, "the proposed settlement must stand or fall as a whole." *Holden v. Burlington N., Inc.*, 665 F.Supp. 1398, 1406 (D.Minn. 1987).

■ Three of the factors set forth by the Eighth Circuit can be dealt with summarily in this case. There is no dispute regarding ITT's financial condition, and the parties agree that continuing this litigation would be complex and expensive. There has not been a great deal of opposition to the proposed settlement in terms of sheer numbers. However, two class members, appearing through their attorneys, have set forth serious objections to the proposed settlement. Moreover, the Court received a significant number of letters and telephone calls from class members who thought the notice meant that they were being sued by ITT. This response strongly suggests that class members may not have fully understood the terms of the proposed settlement. Therefore, the Court discounts the significance of the small number of objectors.

■ The Court's decision in this case turns on the question of whether the Amended Settlement Agreement confers adequate value to the class in light of the merits of their case. Reluctantly, the Court concludes that the proposed settlement, as it is currently structured, fails to meet this standard. In reaching this decision, the Court does not presume to second-guess counsel's evaluation of the merits of this action or to challenge the integrity of the negotiations leading up to this proposed settlement. Nor does the Court reject the legitimacy of scrip settlements in certain circumstances. Decisions from both federal and state courts demonstrate the widespread use of scrip in settling class actions.[5] Likewise, recent newspaper

---

4. The defendants do not oppose Blesi's intervention for this limited purpose. (Defs.' Mem.Opp'n Interven. of Blesi at 1.)

5. *See, e.g., In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 308–09 (N.D.Ga.1993) (approving class action settlement involving cash and discount travel certificates); *In re Coordinated Pretrial Proceedings in Petroleum Prods. Anti-*

*trust Litig.*, No. MDL 150, 1993 WL 39306, at *2 (C.D.Cal. Jan. 12, 1993) (approving class action settlement involving cash and vouchers); *Davis v. New York City Hous. Auth.*, Nos. 90 Civ. 0628 & 92 Civ. 4873, 1992 WL 420923, at *2 (S.D.N.Y. Dec. 31, 1992) (approving class action settlement involving Section 8 housing vouchers); *In re Sears Auto. Ctr. Consumer Litig.*, No. C–92–2227, slip op. at 2 (N.D.Cal. Oct. 29, 1992) (Notice of

accounts demonstrate the increasing popularity of scrip settlements.[6] Instead, the Court concludes that the value offered to the class under the terms of this proposed scrip settlement is simply too tenuous and speculative in nature.

### 2. The Merits of the Plaintiffs' Claims

In its order granting preliminary approval to the original Settlement Agreement, the Court noted that

significant hurdles exist for the class to overcome in seeking compensation for their alleged injuries. These problems include, but are not limited to, the following: (1) whether the individual issue of proving whether each plaintiff's deferral was forged would predominate over common issues of law or fact, thus precluding class certification; (2) whether, for purposes of standing and liability under RICO, non-cash deferral plaintiffs, which represent approximately ninety (90%) percent of the class, could demonstrate an "injury to business or property," where these plaintiffs were not charged any fees for deferral nor

Approval of Class Action Settlement—settlement involving discount coupons for automotive products); *In re Nat'l Media Corp. Sec. Litig.*, 1992 WL 237362, at *1 (E.D.Pa. Sept. 15, 1992) (awarding attorneys' fees in class action settlement involving cash and "product discounts"); *New York v. Nintendo of Am., Inc.*, 775 F.Supp. 676, 679, 681–82 (S.D.N.Y.1991) (approving class action settlement involving coupons, monetary damages, and injunctive relief); *Langford v. Bombay Palace Restaurants, Inc.*, No. 88 Civ. 5279, 1991 WL 61107, at *1 (S.D.N.Y. April 8, 1991) (approving class action settlement involving coupons redeemable at restaurants and hotels or for cash at thirty percent of their face value); *In re Atlantic Air Travel Antitrust Litig.*, No. C.A. 84–1013 (D.D.C. March 18, 1986) (approving class action settlement involving coupons for discounts on transatlantic airfares (settlement described in *Adams v. Pan Am. World Airways, Inc.*, 640 F.Supp. 683, 684 & n. 5 (D.D.C.1986)); *Phemister v. Harcourt Brace Jovanich, Inc.*, No. 77–C–39, 1984 WL 21981, at *2–3 (N.D.Ill. Sept. 14, 1984) (approving class action settlement involving cash payments and discount coupons redeemable on bar review courses or books); *In re Mid-Atlantic Toyota Antitrust Litig.*, 564 F.Supp. 1379, 1382 (D.Md.1983) (preliminarily approving class action settlement involving certificates redeemable for cash, retail goods, or a trade-in allowance); *In re Cuisinart Food Processor Antitrust Litig.*, No. MDL 447, 1983 WL 153, at *2 (D.Conn. Oct. 24, 1983) (approving class action settlement involving coupons for new products); *New York v. Dairylea Coop. Inc.*, 547 F.Supp. 306, 307 (S.D.N.Y.1982) (refusing to approve class action settlement involving cash expenditures and discount coupons for dairy products), *appeal dismissed*, 698 F.2d 567 (2d Cir.1983); *Ohio Pub. Interest Campaign v. Fisher Foods*, 546 F.Supp. 1, 5 (N.D.Ohio 1982) (approval of class action settlement involving coupons redeemable for groceries); *Tornabene v. General Dev. Corp.*, 88 F.R.D. 53, 56–57 (E.D.N.Y.1980) (approving class action settlement involving cash expenditures for real estate improvements and coupons redeemable for meals); *In re Montgomery County Real Estate Antitrust Litig.*, 83 F.R.D. 305, 312 (D.Md.1979) (approving class action settlement involving certificates redeemable for discounts on brokerage fees); *Sampson v. Eastman Kodak Co.*, 195 Ill. App.3d 715, 142 Ill.Dec. 453, 455, 552 N.E.2d 1194, 1196 (Ct.1990) (appeal of attorney fees awarded in class action settlement involving cash and coupons); *Hawkins v. Thorp Loan and Thrift Co.*, No. DC 85–6074, slip op. at 5 (Minn.Dist.Ct., Hennepin Co. Feb. 21, 1992) (approval of class action settlement involving cash and coupons).

6. *See, e.g.,* Jeff Pelline, *Nissan Will Buy Back Recalled Mini–Vans*, S.F.Chron., Feb. 4, 1994, at A5 (class action settlement involving coupons redeemable on future vehicle purchases); *Four Airlines to Offer Coupons in Chicago Settlement*, N.Y. Times, Jan. 19, 1994, at D4 (class action settlement involving coupons redeemable for airfare discounts); *S.O.S., Brillo in Settlement*, Chi. Trib., Jan. 11, 1994, at 1 (class action settlement involving coupons redeemable on steel wool pads); *GM Truck Pack OK'd*, Nat.L.J., Dec. 27, 1993, at 6 (settlement involving coupons redeemable on future truck purchases); Milo Geyelin, *Xerox Agrees to Vouchers in Settlement*, Wall St. J., Dec. 8, 1993, at B8 (class action settlement involving vouchers redeemable on Xerox products); Willard Woods, *Edina Realty Offers to Settle District Court Class–Action Suit*, Star Trib. (Minneapolis), Nov. 19, 1993, at 1D (class action settlement involving coupons redeemable for discounts on real estate commissions); Reynolds Holding, *GE Settles Suit Over Energy–Saving Bulbs*, S.F. Chron., Oct. 28, 1993, at A2 (class action settlement involving coupons redeemable on light bulbs); *Settlement*, Chi. Daily Law Bull., Sept. 1, 1993, at 3 (class action settlement involving coupons redeemable on feminine-hygiene products); Florence Fabricant, *Food Notes*, N.Y. Times, May 19, 1993, at C10 (class action settlement involving coupons redeemable on olive oil); David Bailey, *Settlement Seems to Have BMW Buyers Beaming*, Chi. Daily Law Bull., Feb. 10, 1993, at 1 (class action settlement involving certificates redeemable on future vehicle purchases).

At least one national columnist has expressed some reservations about scrip settlements. *See* Dave Barry, *Lawyers Cash In—And Darn It, They've Earned It*, Houston Chron., Nov. 21, 1993, at 15 (Texas Magazine).

were their loan balances or interest payments increased; and, (3) whether plaintiffs can prove the requisite elements of the state small loan acts involving ninety (90%) percent of the plaintiffs. (4/20/93 Order at 6–7.) All of this remains true today. However, as class counsel has stated, there are strong counter-arguments to each of these defenses, and it is not clear that any of them will be fatal to the plaintiffs' claims. (Tr. 4/9/93 Hr'g at 57–60.) The Court has no reason to doubt that both class counsel and ITT have properly weighed the strengths and weaknesses of their respective positions. Therefore, the Court approaches its evaluation of the proposed settlement mindful of the factors that favor compromise.

### 3. The Value Conferred by the Amended Settlement Agreement

Under the terms of the Amended Settlement Agreement, in exchange for a nationwide release, ITT would issue the class members scrip in the form of certificates having an aggregate face value of approximately $47.2 million. Each class member would be entitled to one certificate for each deferral made on each loan during the class period. The certificates would be fully transferrable, and each certificate would entitle the class member or the class member's assignee to his or her choice of a $25 credit on a new non-credit life ("SPT–5") insurance policy, a $25 credit on a new "Thrift Club" membership, or a $25 credit on a loan payment (subject to additional restrictions described below). ITT argues that the third option, the $25 credit on a loan payment, would provide the class with the "vast majority" of the value from this settlement. (Tr. 4/9/93 Hr'g at 26.) The Court will focus its analysis accordingly.

Under the terms of the Amended Settlement Agreement, the certificates cannot be used on existing ITT loans.[7] Instead, they must be used on "new loans," as defined by the Amended Settlement Agreement. Generally, a new loan is defined as a loan made after final approval is granted or a loan that refinances an earlier loan, if the earlier loan exists at the time final approval is granted. A class member can use one certificate per monthly payment, up to a maximum of five certificates. However, the certificates cannot be used until the class member has made three consecutive cash payments without the certificates.

 In support of the proposed settlement, ITT initially argued that this Court need only look to the face value of the scrip certificates to ascertain its value to the class. The Court flatly rejects this proposition and finds that "the true value of the certificates to the class depends on when the certificates will be used, how they will be used, and who will be using them." *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 322 (N.D.Ga.1993).

In response to the Court's concerns about the value of the certificates, ITT has submitted reports prepared by Dr. Timothy Nantell, professor of finance at the Carlson School of Management at the University of Minnesota.[8] In his final report, Dr. Nantell utilized market research on "the use of high value coupons provided to previous users of products" and information from ITT on the borrowing practices of class members and concluded that the value of the certificates ranges from $5.3 million to $12.5 million. (Defs.' App. to Br.Supp.Final Approval Ex. F.)[9]

Dr. Nantell's range of values is largely dependant on two variables—the rate at which class members will take out new loans and the rate at which they will refinance

---

7. At oral argument on these motions, ITT informed the Court that The Associates, with whom ITT has contracted to service the certificates, has agreed to honor the certificates on any loans class members currently have outstanding with The Associates. (Tr. 11/23/93 Hr'g at 30.) Class counsel conceded, however, that they had no idea how many class members had outstanding loans with The Associates. (*Id.* at 20–21.)

8. Counsel acknowledged that Dr. Nantell was retained after the settlement was reached and that his conclusions were not the basis for the negotiations leading up to this settlement. (Tr. 4/9/93 Hr'g at 48.)

9. Dr. Nantell's final report contains only his conclusions. His methodology and analysis are set forth in his preliminary report. (*See* App. to Defs.' Scrip Mem. Ex. H.)

existing loans. Based on past borrowing experience, Dr. Nantell assumed that between five and twenty percent of the class members will take out new loans in any given year. These two extremes were labeled, respectively, "Low New Loan" and "High New Loan." Based on past borrowing experience, Dr. Nantell also assumed that between eighteen and fifty-one percent of the class members with existing loans will refinance them in any given year. These two extremes were labeled, respectively, "Low Refinance" and "High Refinance." Although, historically, only eighteen percent would refinance, Dr. Nantell assumed that this number could go as high as fifty-one percent, because additional class members will refinance to take advantage of the certificates. Dr. Nantell then assumed that the existence of the certificates will result in additional loan activity, or "incentive loans," by eleven percent of the class members, who will take out new loans or refinance existing loans solely to take advantage of the certificates.[10] These incentive loans will then be followed up with second incentive loans by eighteen to one hundred percent of those who originally took out first incentive loans.

Using market research on the promotional use of coupons, Dr. Nantell then assumed that ninety percent of the class members who take out "non-incentive" loans will use the certificates. By definition, one hundred percent of the class members who took out incentive loans will use the certificates. Dr. Nantell then factored in the fact that only fifty percent of the class members will be able to qualify for a new loan under ITT's credit standards and added in the small numbers of certificates that he assumed will be redeemed for life insurance and Thrift Club memberships. Finally, Dr. Nantell calculated the following range of values: High New Loan/High Refinance—$12,505,684; High

New Loan/Low Refinance—$9,179,759; Low New Loan/High Refinance—$8,415,046; and Low New Loan/Low Refinance—$5,337,903.[11]

Objectors Blesi and Grennier question many of Dr. Nantell's assumptions and argue that, even if his analysis is accepted, his data reveals the limited value of the scrip. Since Dr. Nantell assumes that fifty percent of the class members will be unable to qualify for new loans because of bad credit histories, the certificates will be of no value to at least half the class members, regardless of whether they want to use them. This fact, by itself, makes the proposed script settlement in this case significantly different than other scrip settlements. In his analysis, Dr. Nantell also assumed that the class members who will not qualify for new loans are entitled to an equal number of certificates as the class members who could qualify for new loans. (Tr. 11/23/93 Hr'g at 68.) However, since a class member is entitled to one certificate for each deferral, and a deferral is only necessary when a payment is not made, an equally plausible assumption would be that the class members who will not qualify for new loans are entitled to a greater number of the certificates.

Dr. Nantell also assumes that a class member will receive a $25 value (discounted for present value) for each certificate he or she redeems. Blesi, however, has submitted an affidavit from Kathleen Keest, a staff attorney at the National Consumer Law Center and a specialist in consumer credit transactions, which challenges this assumption.[12] Keest sets forth examples of how the certificates could be used in the context of a refinanced loan and concludes that "the benefit of the scrip when used toward making installment payments on a refinanced loan is minimal when the cost of the refinancing is accounted for. In fact, it is likely to cost

10. Although there appears to be some cross-over between the High Refinance number and the incentive refinancing, Dr. Nantell presumably accounted for this in his analysis.

11. Dr. Nantell also calculated a fifth value of $18,661,512, by assuming that all class members will use every certificate possible. The Court finds this number to be of little assistance in evaluating the proposed settlement. Presumably, this number should be offset with a sixth value of $0, assuming that no class members will use any certificates.

12. While arguing in support of preliminary approval, class counsel referred to the National Consumer Law Center as "the premier organization that studies this particular area." (Tr. 4/9/93 Hr'g at 43–44.)

borrowers more money to take advantage of this incentive." (Keest Aff. at ¶ 3.) Class counsel and the defendants challenge this conclusion by arguing that many class members would refinance their loans regardless of whether they received the certificates. The Court assumes this assertion to be true, but nonetheless finds that, to the extent that the certificates serve as an incentive to refinance existing loans or to take out new loans, their value is significantly diminished.[13]

As previously explained, ITT is no longer in the consumer loan business. ITT has contracted with The Associates, another consumer lending institution, to service the certificates. Therefore, the certificates will only be redeemable on "new loans" obtained through The Associates. This development alleviates the objections of those class members who refused to continue doing business with ITT or who objected to the windfall of additional business the proposed settlement could generate for ITT. Likewise, The Associates will have every incentive to solicit the certificates. However, the Court has some concern about the effect this development could have on the number of certificates that would eventually be redeemed. In his report, Dr. Nantell states that "the loyalty of this borrowing segment to their current lenders increases the likelihood that the class members will borrow from ITT and will, therefore, use the certificates provided to them by way of the proposed settlement." (App. to Defs.' Scrip Mem.Ex. H at 2.) Likewise, in support of preliminary approval, ITT argued that allowing the certificates to be redeemed for credit on loan payments would be "especially valuable because of the number of class members who are repeat customers of defendants." (Defs.' Scrip Mem. at 22 n. 8.) These assumptions, of course, no longer hold true.

At oral argument on these motions, the Court expressed concern about the low rate of redemption for certificates used in the settlement of a previous case involving ITT. In *Hawkins v. Thorp Loan and Thrift Co.*, No. DC 85–6074, slip op. at 5 (Minn.Dist.Ct., Hennepin Co. Feb. 21, 1992), the Minnesota state district court approved a class action settlement in which four of the five subclasses received scrip as partial compensation. In response to the Court's request, ITT supplied the following data regarding the scrip's redemption:

| CLASS | FACE VALUE OF CERTIFICATES | NUMBER OF CERTIFICATES ISSUED | PRODUCT ON WHICH CERTIFICATES COULD BE REDEEMED | NUMBER OF CERTIFICATES REDEEMED AS OF 2/28/93 [14] | PERCENTAGE OF CERTIFICATES REDEEMED |
|---|---|---|---|---|---|
| Two | $39.00 | 126,321 | Property Insurance | 3,140 | 2.486% |
| Three | $29.00 | 96,754 | Thrift Club Membership | 2 | .002% |
| Four | $39.00 | 445,465 | Credit Life Insurance | 14,597 | 3.277% |
| Five | $19.00 | 409,538 | Credit Disability Insurance | 7,838 | 1.914% |

13. Dr. Nantell states that "the range in valuations [of the certificates] depends most significantly on the normal new borrowing activity of class members in the absence of the incentives provided by the certificates and on *whether the provision of the certificates results in substantial increases in the refinancing activity of class members.*" (App. to Defs.' Scrip Mem. Ex. H at 2) (emphasis added).

14. At oral argument, ITT informed the Court that the number of certificates redeemed has not changed since this date. (Tr. 11/23/93 Hr'g at 28.)

The Court recognizes that the certificates in *Hawkins* were not redeemable on loan payments, and, therefore, the redemption rates in *Hawkins* are not directly applicable to the settlement proposed in this case. The Court is not convinced, however, that the low redemption rates have no bearing on the value of this proposed settlement. The *Hawkins* certificates were presumably sent to the same consumer class as is involved in this case. The extremely low rates of redemption strongly suggest that the *Hawkins* class members either perceived the certificates as having very little value or did not understand how to use them. Furthermore, as Blesi points out, the certificates in this case, which were mailed to the class with the notice of the proposed settlement, list the redemption option of receiving credit toward the purchase of life insurance first. Therefore, a cursory review of the certificates could lead a class member to conclude that the certificates in this case are similar to those issued in *Hawkins*.

These questions about the value of the scrip become more serious in light of the proposed settlement's lack of any form of guaranteed minimum value. ITT's reluctance to offer solely a cash settlement in this case is understandable. Not so understandable, however, is ITT's refusal to guarantee a minimum cash contribution. Scrip settlements are often structured to ensure a minimum payout by the settling defendants. For example, in *Ohio Pub. Interest Campaign v. Fisher Foods, Inc.*, 546 F.Supp. 1, 5 (N.D.Ohio 1982), the court approved a class action settlement involving the use of "Food Purchase Certificates." However, "[r]ecognizing the likelihood that many Food Certificates [would] not be used by their recipients," the settlement further provided that the defendants would make payments of food or cash to charitable organizations "to the extent that Certificates [were] not redeemed in any given year." *Id.* In *Langford v.*

*Bombay Palace Restaurants, Inc.*, No. 88 Civ. 5279, 1991 WL 61107, at *1 (S.D.N.Y. April 8, 1991), and *In re Mid–Atlantic Toyota Antitrust Litig.*, 564 F.Supp. 1379, 1382 (D.Md.1983), the coupons issued as part of the settlements were redeemable for product discounts or, alternatively, for a lesser amount of cash. In other cases, scrip is used in class action settlements in conjunction with cash payments. *See, e.g., In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 305 (N.D.Ga.1993); *In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litig.*, No. MDL 150, 1993 WL 39306, at *2 (C.D.Cal. Jan. 12, 1993); *New York v. Nintendo of Am., Inc.*, 775 F.Supp. 676, 679 (S.D.N.Y.1991). The court can then look to the cash payout as the benchmark for evaluating the proposed settlement. In this case, ITT asks the Court to find that the certificates have a significant value to the class members but is unwilling to establish a bottom line, despite the Court's numerous concerns.

At oral argument on these motions, the Court questioned counsel about the absence of a minimum dollar amount in this settlement. (*See* Tr. 11/23/93 Hr'g at 15–17, 27–28, 95–96.) In response, ITT argued that the merits of this case simply do not warrant a guaranteed minimum. ITT, however, is no longer in the consumer loan business. ITT has contracted with The Associates to service the certificates, and each certificate that is redeemed will cost ITT $25. Because it is no longer in the consumer loan business, ITT will not be able to offset the cost of these certificates with the profits from any new business generated by their use. Therefore, the Court can only assume that ITT's refusal to establish a minimum cash contribution reflects the economic value it places on the possibility that these certificates will not be redeemed at the rates predicted by its expert.[15]

---

15. In response to the Court's suggestion that ITT offer to pay cash if a minimum number of certificates are not redeemed, ITT also argued that establishing such a minimum would create a disincentive to use the certificates. This response ignores the fact that each class member would be placed in a situation whereby he or she would be forced to choose between a lesser, but guaranteed, benefit and a greater benefit contingent on the cooperation and restraint of thousands of other class members. Under these circumstances, it is highly unlikely that any individual class member would choose not to redeem his or her certificates.

### 4. The Release

■ The Amended Settlement Agreement grants ITT, in exchange for the scrip, a broad, nation-wide release of any claim that was or could have been asserted in this action, or which "arises out of or is in any way related to the consumer loans of any or all class members." (Amended Settlement Agreement at 20.) Specifically excluded from this broad release are collection actions brought by ITT and claims against ITT based on consumer loan collection practices, computational errors, and payment of insurance benefits.[16] (*Id.* at 28–29.) Also excluded from the release are any claims asserted in any one of the eleven pending lawsuits listed in the agreement and "any other claims alleged as of February 1, 1993." (*Id.* at 20–22.)

Grennier and Blesi both argue that this release is overbroad. The Court makes no judgment as to whether a release of all claims arising out of or related to consumer loans is appropriate in a lawsuit alleging deferral forgeries, but notes that a defendant would normally be expected to pay a premium for this type of "global peace."

■ Blesi also points out the ambiguous nature of the release. Because the release excludes all claims asserted in the eleven pending suits and "any other claims alleged as of February 1, 1993," an individual contemplating a suit against ITT would have to research what claims had been asserted against ITT as of February 1, 1993, to know whether he or she had a viable cause of action. The inherent difficulties with this type of release were illustrated at oral argument when class counsel and ITT could not agree about whether class "insurance packing" claims were excluded from the release. (Tr. 11/23/93 Hr'g at 76, 98.)

### 5. Conclusion

In light of the Court's reservations about the value of the scrip and the ambiguous nature of the release, the Court cannot find that the proposed settlement is fair, reasonable, or adequate. Therefore, the Court will deny final approval.

Accordingly, based upon a review of all the files, records, and proceedings herein,

**IT IS HEREBY ORDERED** That the joint motion by class counsel and the defendants for final approval of the Amended Settlement Agreement is DENIED;

**IT IS FURTHER ORDERED** That the classes provisionally certified as part of this Court's April 20, 1993 order are DECERTIFIED;

**IT IS FURTHER ORDERED** That the motion by class member Mark Grennier to intervene for the limited purpose of appealing any settlement approved by this Court is GRANTED;

**IT IS FURTHER ORDERED** That the motion by class member Joyce Blesi to intervene for the limited purpose of appealing any settlement approved by this Court and participating in future settlement negotiations is GRANTED; and

**IT IS FINALLY ORDERED** That the neither the defendants nor class counsel are required to respond to the Complaints in Intervention served by Grennier and Blesi.

---

**16.** The Amended Settlement Agreement also recites that "Plaintiffs and their counsel agree that claims based on [consumer loan collection practices, computational errors, and payment of insurance benefits] *will be limited to individual as opposed to class claims or suits.*" (Amended Settlement Agreement at 28–29) (emphasis added). Grennier and Blesi objected to this provision, arguing that it unnecessarily limited future

litigants. *At oral argument, class counsel explained that this provision was nothing more than their statement of belief that these claims are not "susceptible to class litigation" and that this opinion would not prevent other class members from bringing class claims. (Tr. 11/23/93 Hr'g at 79.) Although the Court appreciates the clarification by counsel, this interpretation would hardly be obvious to future litigants.