Jean E. CLEMENT, Frank J. Giron, Frederic I. Katz and Doris F. Davis, on behalf of themselves and all others similarly situated,

v.

**AMERICAN HONDA FINANCE CORP. and Trans Oceanic Motors, Ltd., d/b/a Cardinal Honda.**

No. 3:95cv660 (AHN).

United States District Court,
D. Connecticut.

Oct. 30, 1997.

Cathleen Combs, Edelman & Combs, Chicago, IL, Joanne Faulkner, New Haven, CT, for plaintiffs.

Mark Seiger, Janet Helmke, Halloran & Sage, Hartford, CT, for defendants.

## MEMORANDUM OF DECISION

NEVAS, District Judge.

The plaintiffs, Jean E. Clement ("Clement"), Frank J. Giron ("Giron"), Frederic I. Katz ("Katz") and Doris F. Davis ("Davis"), bring this action on behalf of themselves and all others similarly situated, against the defendants, American Honda Finance Corp. ("AHFC") and Trans Oceanic Motors, Ltd., d/b/a Cardinal Honda ("Cardinal"), for, *inter alia*, violations of the federal Consumer Leasing Act, 15 U.S.C. §§ 1667—1667f (the "CLA"). On May 27, 1997, the court, *inter alia*, conditionally certified a settlement class in this matter and preliminarily approved the settlement agreement presented by the parties. On September 30, 1997, the court held a final hearing to consider whether the terms and conditions of this settlement are fair, adequate and reasonable to the class.

For the reasons stated below, the settlement agreement is REJECTED, the conditional certification of the class and subclass described in the settlement agreement is REVOKED, and these classes are hereby DECERTIFIED.

## BACKGROUND

### I. The Claims

AHFC is a California corporation registered to do business in Connecticut. (See First Am. Compl. ¶ 7.) As part of its regular business activities, it purchases motor vehicle lease agreements originated by Honda and Acura dealers. (*See id.* ¶ 8.) Cardinal, a Connecticut corporation doing business in Groton, Connecticut, sells and leases automobiles. (*See id.* ¶ 9.) AHFC allegedly supplies Cardinal and other Honda and Acura dealers with blank copies of its lease agreements to be used for the leases that AHFC purchases. (*See id.* ¶ 12.)

On August 11, 1992, Clement signed a sixty month "Closed–End Vehicle Lease

Agreement" with Cardinal for the lease of a 1992 Honda Accord. (*See id.* ¶ 13.) Total payments under the lease were $17,593. (*See id.* ¶ 15.) By its terms, the lease was immediately assigned to AHFC, and Clement was to make all lease payments to AHFC. (*See id.* ¶ 13, 16.)

On or after May 19, 1994, Clement terminated the lease because, as a result of her separation and subsequent divorce from her husband, she could no longer afford the lease payments. (*See id.* ¶ 20.) This constituted an early termination of the lease agreement and, according to the terms of the agreement, resulted in a substantial termination charge. (*See id.* ¶ 21.) Clement has since refused to pay this fee, and, as a result, her credit has been adversely affected. (*See id.* ¶ 23–24.)

Under the CLA, which only applies to leases with terms exceeding four months and total contractual obligations of less than $25,000, lessors regularly engaged in the business of leasing and offering to lease vehicles to individuals purchasing them for personal use must make ·certain disclosures in the lease contract. See 15 U.S.C. § 1667. Clement, along with Katz and Davis, both of whom entered into the exact same lease agreement as Clement, (see First Am. Compl. ¶¶ 35—49), alleges that the lease agreement does not comply with these disclosure requirements.

Specifically, she claims that the lease agreement does not "clearly and conspicuously disclose the method for determining the charge for a default or other early termination." (*Id.* ¶ 62.) The formula given to calculate early termination fees is, according to Clement, so confusing that the ordinary consumer cannot determine how much he or she will owe as a result of early termination. (*See id.* ¶ 62(a).) In addition, Clement claims that "[t]he failure to specify the particular contractual promises that are incorporated by th[e] [early termination] provision makes the early termination disclosures ambiguous and unclear." (*Id.* ¶ 62(d).)

Furthermore, she alleges that the warranty disclosures in the agreement are defective. (*See id.* ¶ 64.) The warranty disclosures do not identify the express warranties to which the vehicle is subject, but instead simply state that the vehicle is subject to assignable warranties, requiring the lessee to determine what warranties are assignable. See 12 C.F.R. § 213.4(g)(7). The disclosures also do not address, where applicable, the purchase of a manufacturer's extended warranty. (See First Am. Compl. ¶ 64.) Lastly, Clement alleges that the lease agreements "contain additional information disclaiming responsibility for warranty and mechanical problems that does not conform to the CLA because it is misleading, confusing and contradictory."[1] (*Id.* ¶ 65.)

Clement, Katz and Davis bring this class action on behalf all persons who (1) signed leases with AHFC with warranty and early termination disclosures similar to those in their lease agreements; (2) did not check the "Commercial Lease" box on the lease form; and (3) were not obligated to pay more than $25,000 under the lease agreement.[2] (*See id.* ¶ 68.) They seek statutory damages, punitive damages, attorneys' fees, a declaration that the default/early termination charges provided for in the lease agreements are unlawful and unenforceable, and a refund of all the default/early termination fees that

---

1. According to Clement, the lease agreement states, under the heading "Assignment," that Clement "acknowledge[s] that AHFC will not have to make any repairs, maintain the vehicle, or perform any of the Dealer's duties under this lease." (First Am. Compl. 65(b).) It further states, under the heading "Indemnity Agreement," that Clement agrees to hold AHFC harmless and "indemnify [it] against any losses, damages, claims, injuries, demands and expenses arising out of the maintenance, use condition, operation, or ownership of the vehicle." (*Id.* ¶ 65(a).) Clement alleges that these provisions

violate 16 C.F.R. § 433.2(b) by not preserving her defenses against AHFC. (*See id.* 65(c).) Also, she claims that these disclosures violate 12 C.F.R. § 213.4(b) by indicating that AHFC is not liable for warranty and mechanical problems, contradicting the lease's specific warranty disclosure provisions. (*Id.*)

2. Clement also brings this action on behalf of a subclass of persons who signed leases with Cardinal.

AHFC has collected from members of the class.[3] (*See id.* ¶ 77(a)–77(d), 99(a)–99(f).)

In addition to the CLA claim, Clement, Katz and Davis, bring a state law claim under the unfair trade practices statute in each class member's state. (*See id.* ¶ 83.) They claim that in each of their lease agreements, the "capitalized cost" of the vehicle, which is "the economic equivalent of the cash sale price of the vehicle and related items," was equal to or greater than the vehicle's MSRP. The capitalized cost is used to determine both the monthly lease payment and, along with other factors, the default/early termination fee. Clement, Katz, and Davis maintain that they were unable to figure out the capitalized cost of the vehicles from the numbers and formulas provided in the lease agreement, and, that had they understood that the cost was equal to, or greater than the MSRP, they would not have entered into the lease. (*See id.* ¶¶ 79–82.) They claim that this failure to disclose the capitalized cost constitutes an unfair and deceptive trade practice, in violation of the applicable state statutes.[4] (*See id.* ¶ 87.)

Notwithstanding the claims made by Clement, Katz and Davis, Giron also makes claims in connection with his AHFC lease agreement. Unlike Clement, Davis and Katz, however, Giron does not merely allege that his lease agreement made insufficient disclosures. Rather, he alleges that the Acura that he purchased was defective.[5] These claims, however, are unrelated to the allegations which form the basis of this class action, and, therefore, the court will not consider them in connection with the settlement. In response to the court's questions at the final hearing as to Giron's role in this suit,

the parties agreed to withdraw his name from the case.[6]

## II. *The Settlement*

On May 27, 1997, the court issued an order which, *inter alia,* (1) permitted Clement to amend her complaint to add additional named plaintiffs to represent the class; (2) conditionally certified for settlement purposes a class of all persons that, on or before May 27, 1997, leased a Honda or Acura under a closed-end lease agreement written on an AHFC lease form and assigned to AHFC; (3) appointed Clement, Giron, Katz and Davis to represent the class; and (4) preliminarily approved the settlement agreement between the proposed class and the defendants. (*See* Order Regarding Am. Compl., Proposed Class Action Settlement, Settlement Hr'g and Notice of Pendency and Proposed Settlement at 2–3.)

Under the proposed settlement preliminarily approved by the May 27, 1997 order, Clement, Katz and Davis will each receive $2500. (*See* Joint Application for Orders Permitting Am. Compl. and Approving Classwide Settlement of Action [hereinafter "Joint Appl."] at 8–9.) In addition, AHFC will waive Clement's deficiency, and this unpaid debt will be erased from her credit file. (*See id.* at 9.) With respect to the plaintiffs' counsel, AHFC has agreed to pay $139,000 in attorneys' fees, and Cardinal has agreed to pay $1000. (*Id.*)

The proposed settlement provides for two different subclasses based upon each class member's trade-in status. Members of the "Trade-in Deficit Subclass," which is com-

---

3. According to the parties, 650,000 notices were sent out to potential class members and only 1000 opt-outs were received. (*See* Pls.' Mem. Supp. Final J. Order Approval Settlement Agreement at 3.)

4. Clement, Katz and Davis also reallege their CLA claim as an unfair trade practices claim. For example, they claim that "[t]he imposition of substantial default/early termination charges that are disclosed in a manner incomprehensible to the average consumer," (First Am. Compl. ¶ 85), and "the failure to disclose material lease terms as required by the [CLA]," (*id.* ¶ 86), constitute unfair and/or deceptive trade practices.

5. He claims that, as a result of the combined negligence of AHFC, the Acura dealer from

which he purchased the car, and an Acura mechanic, he was forced to spend thousands of dollars to attempt to repair the car and, eventually, had to trade it in and purchase another car. (*See* First Am. Compl. ¶ 25–34.)

6. The CLA claim states that "[t]he claims of Ms. Clement, Mr. Katz and Ms. Davis are typical of those of the class members and, in the case of Ms. Clement, the subclass members they seek to represent." (First Am. Compl. ¶ 72.) Thus, with respect to this claim, Giron does not represent the class. Even if the parties maintain that Giron is attempting to bring a state law unfair practices claim, the court would not have jurisdiction over this claim because it does not arise,

prised of all class members who turned or traded in their vehicle prior to the lease termination date, thereby incurring an early termination charge, will receive a $150 coupon payable towards their next lease or purchase on credit of a Honda or Acura through AHFC. (*See id.* at 6.) However, AHFC will not provide a member of this subclass with a coupon if he or she owes a deficiency of $150 or more on an AHFC lease due to default or early termination. (*Id.*) Members of the "Non–Trade–in Deficit Subclass," which is comprised of all class members not part of the "Trade-in Deficit Subclass," will receive a $75 coupon payable towards their next lease or purchase on credit of a Honda or Acura through AHFC. (*See id.* at 6–7.) AHFC will not provide a member of this subclass with a coupon if he or she owes $75 or more to AHFC due to default or early termination. (*Id.*) Class members who do not have an existing car loan or lease must use their coupons within two years from the date on the coupon. Class members who do have an existing lease or financing agreement must use their coupons within three months of the termination of that agreement, but not more than three years after the date on the coupon. (*See id.* Ex. A at 22–23.) These coupons are not transferrable to any third party other than a "household member," defined as an individual living in the same household as the class member. (*See id.* Ex. A at 14, 22.)

Lastly, with respect to all class members who owe a default or early termination fee to AHFC, AHFC has agreed to accept fifty percent of the amount owed as full payment for the deficiency, provided that payment is made within 120 days of the settlement.

(*See id.* at 8.) AHFC will accept seventy-five percent of the amount as full payment from those class members who do not make payment within 120 days of the settlement. (*Id.*) These deficiency credits are not transferrable to any third party. (*See id.* Ex. A at 19.)

Upon final judgment, all class members who have not opted out of the settlement class will relinquish and be permanently enjoined from bringing any and all claims alleged in this action. (*See id.* at 8–9.) In addition, such class members will release all claims related to (1) early termination and warranty disclosures; (2) disclaimer of warranties; and (3) unfair or deceptive trade practices. (*See id.* at 9.)

## DISCUSSION

Potential class members who objected to the settlement raised two concerns. First, the proposed class is not certifiable under the requirements of Rule 23, Fed.R.Civ.P. Second, the terms of the actual settlement are not adequate, fair, and reasonable. The court finds merit in both of these contentions.

### I. *Decertifying the Settlement Class*

■ The Supreme Court has held that settlement classes can only be certified if all of the requirements for class certification under Rule 23 are met. *See Amchem Prods. Inc. v. Windsor*, — U.S. —, — – —, 117 S.Ct. 2231, 2247–48, 138 L.Ed.2d 689 (1997).[7] When considering the propriety of a settlement class, the fact of settlement is "relevant to class certification" and compels "heightened" attention to the requirements "designed to protect absentees by blocking unwarranted or over broad class definitions." *Amchem*, — U.S. at —, 117 S.Ct. at 2248; *see also Mars Steel Corp. v. Continental Ill. Nat'l Bank & Trust Co. of Chicago*, 834 F.2d 677, 681–82 (7th Cir.1987) (stating that, where class certification has been deferred to the settlement stage, the court's inquiry should be "especially careful and penetrating").

Rule 23(a) specifies the following requirements for bringing a class action:

(1) the class [must be] so numerous that joinder of all members is impractical, (2) there [must be] questions of law or fact common to the class, (3) the claims or defenses of the representative parties [must be] typical of the claims or defenses of the class, and (4) the representative

as it must, from the same transaction and set of circumstances as the other plaintiffs' federal CLA claim. *See* 28 U.S.C. § 1367(a).

**7.** The Supreme Court did state that, when "confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems." *Amchem*, — U.S. at —, 117 S.Ct. at 2248; *see also* Fed.R.Civ.P. 23(b)(3)(D). This is not an issue here.

parties must fairly and adequately protect the interests of the class.

Rule 23(a), Fed.R.Civ.P. In addition, where, as here, the plaintiffs allege that the class action is maintainable under Rule 23(b)(3), (*see* First Am. Compl. ¶ 75),[8] they must show that common questions "predominate over any questions affecting only individual members" and that a class action is "superior to other available methods for fair and efficient adjudication of the controversy." Rule 23(b)(3); *see also Amchem*, —— U.S. at ——, 117 S.Ct. at 2246 (stating that, in certifying a class, courts must weigh "the competing tugs of individual autonomy for those who might prefer to go it alone or in a smaller unit . . . and systemic efficiency").

Recently, in a nationwide class action suit alleging that an automobile lease violated the CLA and various state laws, the Northern District of Illinois rejected a proposed settlement by decertifying the settlement class. *See Laughman v. Wells Fargo Leasing Corp.*, No. 96–C–925, 1997 WL 567800, at *1 (N.D.Ill. Sept. 2, 1997). Similar to the settlement here, the settlement in that case (1) entitled class members to a nontransferable $75 certificate per lease that could have been applied to monthly payments on a new automobile lease; (2) released all claims asserted, or that might have been asserted, arising from disclosures made on, or in connection with, the leases; and (3) paid $2,000 to the named plaintiff and $75,000 in attorneys' fees to the plaintiff's counsel. *See Laughman*, 1997 WL 567800, at *2.

According to the *Laughman* court, the plaintiff failed to establish that Rule 23(b)(3)'s predominance requirement had been met because "absent class members possess, and will relinquish, potentially divergent state claims whose significance is unknown." *Id.* at *4. The court also questioned whether the adequacy of representation requirement had been met because the named plaintiff's injury differed from other class members in that he had not suffered any penalties under his lease. *See id.* at *5.[9]

■ As in *Laughman*, this class fails to meet the requirements of Rule 23(a)(4) and Rule 23(b)(3). First, the representative parties *do not* fairly and adequately represent the interests of the class. While the named plaintiffs each secured a $2500 cash payment for themselves and a $140,000 attorney fee award for their attorneys, the individual class members were to receive, as discussed more fully below, a worthless coupon and deficiency credit. In support of this settlement and their argument that they are adequately representing the interests of the class, the named plaintiffs claim that this settlement reflects the inherent weaknesses of their claims. However, if these claims are as weak as the plaintiffs claim, they should not be entitled to collect two and one half times more than they could have recovered had they brought a strong CLA claim individually and received the statutory maximum $1000 award. *See* 15 U.S.C. § 1640(a)(2)(A)

■ Further, Rule 23(b)(3)'s commonality requirement has not been met because common issues do *not* predominate over individual ones. As to the CLA claim, the standard for determining whether a lease agreement violates the CLA is much higher in the Sev-

---

8. While the plaintiffs allege in the First Amended Complaint that certification is appropriate under Rule 23(b)(2) because the defendants have "enforced a common policy against, and acted in a uniform manner with respect to, the [class]," (First Am. Compl. 74), the settlement class does not seek declaratory and injunctive relief and, thus, proceeds solely under Rule 23(b)(3). See Rule 23(b)(2) (stating that a class action may be maintained where "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief").

9. While the court also noted that "the superiority of a nationwide class whose individual members

may have varying state law claims is suspect, particularly where the CLA authorizes state-wide class actions, each with a separate damages cap of $500,000," *Laughman*, at *5, this court does not rely on that portion of the opinion. The CLA *does not* authorize state-wide class actions, each with a separate $500,000 damages cap, where each suit arises out of the same set of facts. See 15 U.S.C. § 1640 (stating, "[T]otal recovery under this subparagraph in any class action or *series of class actions arising out of the same failure to comply by the same creditor* shall not be more than the lesser of $500,000 or 1 per centum of the net worth of the creditor") (emphasis added).

enth Circuit than it is in the Second Circuit. *Compare Lundquist v. Security Pacific Auto, Fin., Serv., Corp.*, 993 F.2d 11, 15 (2d Cir.1993) (holding that where a termination fee formula is beyond the understanding of the ordinary consumer, a CLA violation has occurred) *with Channell v. Citicorp Nat'l Serv., Inc.*, 89 F.3d 379, 383 (7th Cir.1996) (holding that if the lessor "name[d] a method without providing an elaboration of the method's operation," no violation would occur). Thus, class members who reside in Illinois, Indiana and Wisconsin will have a much more difficult time maintaining their CLA claims than those who live in New York, Connecticut and Vermont. To the extent that the settlement reflects these conflicting positions, members of the class who reside in the Second Circuit will be harmed by inclusion of members residing in the Seventh Circuit.

As to the class members' state law unfair trade practices claims, the propriety and nature of these will vary according to the state in which each individual class member brings his or her claim. For example, while many states' unfair trade practices statutes allow for private causes of action and provide for minimum statutory damages ranging between $25 and $2000,[10] other states' statutes either do not provide for private causes of action,[11] or specify that actual damages can be recovered in a private action, but do not provide for minimum damage awards.[12] All states do not have the same unfair trade practices act, and, some class members may be entitled to substantially more relief depending on the state in which they proceed.

*Compare* Haw. Rev. Stat. § 480-13 ( requiring payment of $1000 minimum statutory damages upon showing of unfair methods of competition or deceptive trade practices) *with* Ark. Stat. § 4–88–101 (failing to provide for private cause of action). The Supreme Court has noted that differences in state law may compound the disparities between class members which undermine the cohesion necessary to satisfy Rule 23's predominance requirement. See *Amchem*, ⸺ U.S. at ⸺, 117 S.Ct. at 2250.

■ Lastly, the superiority requirement of Rule 23(b)(3) has not been met here because a class action is not "superior to other available methods for fair and efficient adjudication of [this] controversy." Fed.R.Civ.P. 23(b)(3). The parties' main argument in support of the settlement, *i.e.* that it is just when compared to the CLA's $500,000 damages cap, actually supports finding that a class action is not the superior method for adjudicating the controversy. Since 650,000 notices were sent out and only 1000 opt-outs were received, if this class action suit went to trial and resulted in the maximum $500,000 cash award available under the CLA, each class member would be entitled to less than one dollar of the total settlement. See 15 U.S.C. § 1640(a)(2)(B) (limiting the award in a class action under the CLA to "the lesser of $500,000 or 1 per centum of the net worth of the creditor").[13] Each class member would unquestionably fare better by bringing an individual action alleging CLA and unfair trade practices claims. First, by bringing an individual action, they would not forego their unfair trade practices claims, which in many

---

10. *See* Ala.Code § 8–19–10 ($100 statutory minimum); Alaska Stat. § 45.50.531 ($200 statutory minimum); Colo.Rev.Stat. § 6–1–113 ($250 statutory minimum); Haw.Rev.Stat. § 480-13 ($1000 statutory minimum); Idaho Code § 48–608 ($1000 minimum); Mass. Gen. Laws ch. 93A § 9 ($25 statutory minimum); Mich. Comp. Laws § 445.911 ($250 statutory minimum); Mont.Code § 30–14–133 ($200 statutory minimum); N.H.Rev.Stat. § 358–A:10 ($1000 statutory minimum); N.M. Stat. § 57–12–10 ($100 statutory minimum); N.Y. Gen. Bus. Law §§ 349(h) ($50 statutory minimum); Ohio Rev.Code § 1345.09 ($200 statutory minimum); Or.Rev. Stat. § 646.638 ($200 statutory minimum); Pa. Stat. tit. 73 § 201–9.2 ($100 statutory minimum); R.I. Gen. Law § 6–13.1–5.2 ($200 statutory minimum); Utah Code § 13-5-14 ($2000 statutory

minimum); Va.Code § 59.1–204 ($500 statutory minimum); and W. Va.Code § 46A–6–106 ($200 statutory minimum).

11. *See* Ark. Stat. § 4–88–113; Del.Code tit. 6 § 2514; Iowa Code § 714.16; and N.D. Gen. Stat. § 51–15–04.

12. *See, e.g.,* Conn. Gen.Stat. § 42–110q; Fla. Stat. § 501.211; Ga.Code. § 10–1–399; La.Rev. Stat. § 51:1409; and N.J. Stat. § 56:8–19.

13. While the parties did not present any evidence as to AHFC's net worth, for the purposes of this ruling the court assumes that one percent of its net worth is greater than $500,000.

states could result in payment of statutory minimum damages. *See, e.g.,* Mich. Comp. Laws § 445.901; Ohio Rev.Code § 1345.01; Pa. Stat. tit. 73 § 201–1; R.I. Gen. Law. § 6–13.1–1. Furthermore, regardless of the potential recovery under the applicable unfair trade practices statute, under the CLA, an individual plaintiff would be entitled to a *minimum* of $100 and a maximum of $1000. *See* 15 U.S.C. § 1640(a)(2)(A). This recovery is substantially greater than the de minimis recovery that the class member would receive under § 1640's $500,000 damages cap.

For these reasons, this proposed settlement class is not certifiable under the requirements of Rule 23.[14] However, even if the proposed settlement class could have been certified, the court would have rejected the settlement as an unreasonable compromise of the class members' claims.

## II. *Rejecting the Terms of the Settlement*

 In order to be approved, a settlement must be adequate, fair and reasonable. *See Malchman v. Davis,* 706 F.2d 426, 433 (2d Cir.1983) (citations omitted). "While settlement hearings need not be converted into mini-trials, the facts should be explored 'sufficiently to make intelligent determinations of adequacy and fairness.'" *In re Cuisinart Food Processor Antitrust Litigation,* Civ. No. H–81–170, 1983 WL 153, at *3 (D.Conn. Oct. 24, 1983) (quoting *Malchman,* 706 F.2d at 433). In making such determinations, courts must consider both "the substantive terms of the settlement compared to the likely result of a trial . . . and . . . the negotiating process, examined in light of the experience of counsel, the vigor with which the case was prosecuted, and the coercion or

collusion that may have marred the negotiations themselves." *Malchman,* 706 F.2d at 433 (citations omitted).

In *City of Detroit v. Grinnell Corp.,* 495 F.2d 448 (2d Cir.1974), the Second Circuit set down the following factors as relevant to the determination of the fairness of a settlement:

(1) the complexity, expense and likely duration of the litigation, (2) the reaction of the class to the settlement, (3) the stage of the proceedings and the amount of discovery completed, (4) the risks of establishing liability, (5) the risks of establishing damages, (6) the risks of maintaining the class action through the trial, (7) the ability of the defendants to withstand a greater judgment, (8) the range of reasonableness of the settlement fund in light of the best possible recovery, (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation[.]

*Robertson v. National Basketball Ass'n,* 556 F.2d 682, 684 n. 1 (2d Cir.1977) (citing *Grinnell,* 495 F.2d at 463).

The parties' main argument in support of the settlement falls within the fourth, fifth, eighth and ninth *Grinnell* factors. In short, they claim that the weaknesses of the plaintiffs' case do not justify a larger award to the class.[15] This argument, however, is not persuasive.

First, while the class members receive nontransferable $75 or $150 coupons as a credit against their next financed purchase or lease of a vehicle through AHFC, the named plaintiffs each receive $2500 and the plaintiffs' attorneys receive $140,000. This

---

14. The Second Circuit has also affirmed a district court's denial of class certification in a case in which the named plaintiff claimed that her car lease violated the CLA and applicable state law. *See Lundquist,* 993 F.2d at 14 (holding that the district court did not abuse its discretion in finding that the plaintiff "defined the class too broadly to meet the (a)(2) commonality and the (a)(3) typicality requirements").

15. The court notes that, if the plaintiffs' case is truly as weak as the parties claim, only the named plaintiffs and the plaintiffs' attorneys will be harmed by a rejection of the settlement, which is appropriate considering that, at present, they are the only ones who substantially benefit from

the settlement. The defendants will not be harmed because the danger of a flood of litigation arising from these claims decreases substantially if these claims lack merit. Furthermore, the class members will not be harmed because the foregone settlement is practically worthless. (*See* App. A, Obj. L. Robert Lieb (stating, "I view a $75 coupon, to be used only in future dealings with [AHFC], to be virtually worthless.").) To the extent that class members would be able to maintain individual actions for technical violations of the CLA, they would be better off attaining the $100 minimum statutory damages under the CLA. *See* 15 U.S.C. § 1640(a)(2)(A)

"wide gap between the size of fee awards and the judgments won for individual class members" is cause for concern. *See Tornabene v. General Dev. Corp.,* 88 F.R.D. 53, 60 (E.D.N.Y.1980) (stating, "An attorney may be willing to settle a class action, without due regard for the best interests of class members in order to avoid the risk of defeat at trial.") If the plaintiffs' case is as weak as the parties claim, the named plaintiffs are not entitled to receive two and one half times the maximum individual award under the CLA ($1000), and the plaintiffs' attorneys are not entitled to be so handsomely compensated for bringing the suit. *See Plummer v. Chemical Bank,* 91 F.R.D. 434, 441–42 (S.D.N.Y.1981) (stating that "where representative plaintiffs obtain more for themselves by settlement than they do for the class for whom they are obligated to act as fiduciaries, serious questions are raised as to the fairness of the settlement to the class"), *aff'd,* 668 F.2d 654 (2d Cir.1982). As Thomas R. Willequer stated in his objection, "If Honda did nothing wrong, then there should not be a settlement. If Honda did something wrong, then plaintiffs should only receive payment equal to their loss." (App. A, Obj. Thomas R. Willequer.)

Second, despite the argument that the plaintiffs' case lacks merit, the plaintiffs themselves admit that "[t]he class has an excellent chance of proving a less serious violation of the CLA." (Pls.' Mem. Supp. Final J. Order Approval Settlement Agreement [hereinafter "Pls.' Mem."] at 9.) Thus, according to the plaintiffs' own brief, the CLA claim in the First Amended Complaint has merit and warrants consideration. Even a technical violation of the CLA would require, at minimum, a $100 statutory award to any class member who litigated this case individually. *See* 15 U.S.C. § 1640(a)(2)(A).

Lastly, at this time, the court is unable to assess the viability of the plaintiffs' unfair trade practices claim, the value of which weighs heavily in the court's determination of the settlement's fairness. If these individual state law claims, many of which require the payment of minimum statutory damages, have viability in any jurisdiction, the court must protect the rights of those class members who could bring them. *See United States v. City of Miami, Fla.,* 614 F.2d 1322, 1331 (5th Cir.1980) (stating that the court has the "role as a fiduciary serving as guardian for the unrepresented class members" and must "guard against settlements that may benefit the class representatives or their attorneys at the expense of absent class members").

While "[t]he law favors settlement, particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation," *In re Gen. Motors Corp. Pick–Up Truck Fuel Tank Prod. Liab. Litig.,* 55 F.3d 768, 784 (3d Cir.), *cert. denied sub. nom. General Motors Corp. v. French,* 516 U.S. 824, 116 S.Ct. 88, 133 L.Ed.2d 45 (1995) [hereinafter *"In re GM Trucks"*], it is "necessary to guard against settlements that may benefit the class representatives or their attorneys at the expense of absent class members." *Holmes v. Continental Can Co.,* 706 F.2d 1144, 1147–48 (11th Cir.1983) (citations omitted). The court here recognizes that the complexity, expense, and likely duration of this litigation favor compromise and settlement. *See Grinnell,* 495 F.2d at 463. The court is also cognizant of the parties' claim that the high risks of establishing·liability and damages justify a lower settlement, which, when compared to the range of possible recoveries, is a reasonable compromise. *Id.* However, in light of the fervent objections filed in response to the settlement agreement [16] and the court's finding that the

---

16. While the court only received nineteen written objections to the settlement, the heightened degree of disgust held by these objectors was far more substantial than that expressed in response to any other settlement agreement ever considered by the court. *See generally In re Ford Motor Co. Bronco II Prods. Liab. Litig.,* Civ. A. MDL–991, 1995 WL 222177, at *6 (E.D.La. April 12, 1995) (holding that "a low level of vociferous objection is not necessarily synonymous with ju-

bilant support" and should not be used "to rebut the conclusion that the terms of the settlement are inadequate"). For example, Lynde Selden, II writes:

> You have got to be kidding! You are going to get paid for this settlement? By its terms I get nothing unless I agree to enter into a new lease agreement with the defendants who already cheated me? ... As far as I can tell, your deal

settlement is *not* a reasonable compromise of the class's claims, the court holds that the settlement is not fair and must be rejected. *See Holmes,* 706 F.2d at 1148 (stating that "a disparate distribution favoring the named plaintiffs requires careful judicial scrutiny into whether the settlement allocation is fair to the absent members of the class").

The proposed settlement agreement has five components: (1) the award of coupons which can be used in conjunction with the finance or lease of a car through AHFC; (2) deficiency credits which can be used in conjunction with the payment of early termination charges still owed; (3) a $7500 cash payment to the named plaintiffs; (4) a $140,000 attorneys' fee award; and (5) the release of all claims related to the allegations made in the First Amended Complaint. (*See* Joint Appl. Ex. A.) The court analyzes each of these components in determining the propriety of the settlement.

### A. *Award of Coupons*

Many of the objectors stated that the coupons were worthless because they required the class members to lease or purchase another vehicle through the company against which they were bringing suit. (*See, e.g.,* App. A, Obj. L. Robert Lieb.) They further claimed that $75 or $150 was a pittance compared to the price of a new car. (*See, e.g.,* App. A, Obj. Lynde Selden, II n. 1.)

In determining the value of coupons such as the ones in this case, courts must consider:

> is better for Honda than no deal at all: In theory, they stand-to sell/lease additional vehicles as a result of the incentive to sign a new lease!

(App. A, Obj. Lynde Selden, II.) In addition, Irwin Granat states in his objection:

> I am flabbergasted at the proposed settlement. Coupons which require buying or leasing another car from Honda at a future date which may be as long as 4 years away (as it is in our case) are practically worthless. Maybe the attorneys involved should be paid in "coupons" then there would probably be a more reasonable settlement.

(App. A, Obj. Irwin Granat.) L. Robert Lieb also writes:

> It would be very much appreciated if the court could make known to the parties the absolute disgust with which a customer views the waste

the possibility that some class members would not be able to use the coupons at all; ... [whether] restrictions on the transfer of the certificates present obstacles to the development of a market so as to render the estimates of their worth unreasonably inflated; ... [and] whether the size of the attorney's fee agreement suggests that [defendant] attached a greater value to the class claims than proponents of the settlement would have [the court] believe.

*In re GM Trucks,* 55 F.3d at 807 (3d Cir. 1995). In *In re GM Trucks,* the Third Circuit applied the above factors to determine the propriety of $1000 certificates which class members could use toward the purchase of a new, light-duty truck. In making this determination, the Third Circuit was skeptical as to the number of people that would actually use the coupons and was concerned about the erosion of the coupons future value as truck prices rose. *See id,* at 807–08. It also questioned the fairness of the settlement because people of lesser means who could not afford to buy a GM truck would be unable to benefit comparably from the settlement. *See id.* at 808. As a result, the Third Circuit ruled that the settlement was neither fair nor reasonable, and "was, in reality, a sophisticated GM marketing program." *Id.* at 807.

However, courts have upheld class action settlements involving the distribution of coupons. In *New York v. Nintendo of Am. Inc.,* 775 F.Supp. 676, 679 (S.D.N.Y.1991), the court affirmed a settlement in which the class members were given $5 coupons toward the purchase of a video game for use with the

> of the Court's time, with the only substantial benefit obviously accruing to the attorneys on either side that crafted a settlement that is of dubious benefit to anybody. I only hope that the Court takes this into consideration in fixing the attorneys' fees, as I view a $75 coupon, to be used only in future dealings with [AHFC], to be virtually worthless.

(App. A, Obj. L. Robert Lieb.) Lastly, as Thomas R. Willequer decries:

> The proposed settlement of: 1) $140,000 to the lawyers, 2) $10,000 to the Named Plaintiffs, and a pittance to everyone else is what is wrong with the current legal system. If [AHFC] did nothing wrong, then there should not be a settlement. If Honda did something wrong, then plaintiffs should only receive payment equal to their los[s]. . . .

(App. A, Obj. Thomas R. Willequer.)

Nintendo game system. In *In re Cuisinart*, 1983 WL 153, at *4, the court approved a settlement involving discount coupons worth a maximum of $100 towards the purchase of a new Cuisinart, costing between $100 and $300.

However, in *In re GM Trucks*, the Third Circuit distinguished *Nintendo* and *In re Cuisinart* because they "differ dramatically in the amount of money required to purchase the good-i.e. to realize the certificate's value-and in the frequency with which a typical consumer might expect to purchase the good." 55 F.3d at 808. Further, the Third Circuit recognized that a car is a fungible good which sells in a highly competitive market while in *Nintendo* and *In re Cuisinart*, the goods to be purchased are not as interchangeable. Thus, coupons for cars not only have no value to a person who cannot afford or does not desire to purchase a car, but also severely limit the market in which a consumer may shop. *See In re GM Trucks*, 55 F.3d at 808 (stating that the class members who do use the coupons may only do so because they feel beholden to use them, thus providing GM with sales it might not otherwise have had).

■ The problems that the Third Circuit identified are also present in this proposed class settlement. "[T]he true value of the certificates to the class depends on when the certificates will be used, how they will be used, and who will be using them." *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 322 (N.D.Ga.1993). Here, the coupons are essentially worthless to class members for several reasons.

First, any class member who does not finance or lease a car within the next two years[17] cannot use the coupon. Second, class members that do finance or lease a car in the next two years, but refuse to do so through AHFC will not benefit from the coupon. Class members may not do business

with AHFC either because they want to purchases a vehicle other than a Honda or an Acura, or because they do not wish to continue to do business with the company against which this suit has been brought. Third, for those class members that do actually use the coupon toward the purchase or lease of a new car, the $75 or $150 coupon is virtually worthless when compared to the purchase price of a new car. Even AHFC's corporate representative admitted at the final hearing that the coupon's value was negligible in determining the loss AHFC would suffer from the settlement. Lastly, while the coupons in *In re GM Trucks*, *Nintendo*, and *In re Cuisinart* were all transferrable to third parties and thus had some potential cash value,[18] the coupons in this case are not transferrable to third parties and thus have no cash value. *See Nintendo*, 775 F.Supp. at 681 (stating that "the coupons will be freely transferable ... [which] further enhances [their] value and may render them cash equivalents"); *In re Cuisinart*, 1983 WL 153, at *4 (stating that "the fact that the coupons are transferrable enhances their economic value").

In *Buchet v. ITT Consumer Fin. Corp.*, 845 F.Supp. 684 (D.Minn.), *as amended*, 858 F.Supp. 944 (1994), the court rejected a settlement which would have provided each class member with a fully transferable $25 certificate towards the purchase of a life insurance policy or the repayment of a new loan. The court, relying on its finding that there was a strong probability that the certificates would have an extremely low redemption rate, stated that the settlement had minimal value to the class members and was "simply too tenuous and speculative in nature" to receive judicial approval. *See id*, at 692, 694. The court further held that, despite the parties' claim that the plaintiffs did not merit a minimum cash payout, the defendant's failure to guarantee, as an alternative

---

17. Class members currently engaged in a lease or financing arrangement have three years to use the coupon.

18. This potential for cash value fluctuated depending on the limitations that each settlement imposed on transfers. For example, in *In re GM Trucks*, the settlement allowed class members to

choose a $500 transferrable certificate, rather than the $1000 non-transferrable certificate. *See id.* at 780–81. While the cash value of this transferrable certificate was far less than $1000 face value of the settlement coupons, the coupons still retained some cash value due to the transfer option.

to the certificate, some minimum cash payment to individual class members was fatal to the settlement approval. *See id.* at 696 (stating that "scrip is used in class action settlements in conjunction with cash payments . . . [to provide the court with a] benchmark for evaluating the proposed settlement").

The same concerns exist here. The value of these coupons is too speculative. Absent a transfer option or other guaranty of some minimal cash payment, there is a strong danger that the settlement will have absolutely no value to the class. In fact, Judge Becker's words in *In re GM Trucks* ring true here. These coupons are nothing more than "a sophisticated [AHFC] marketing program." 55 F.3d at 807. For every coupon that AHFC receives, it is able to finance or lease another car. In other words, by merely offering to reduce the price of a car by less than 1% of its price, AHFC is able to increase business and profits by financing the sale and lease of more cars.[19] Mary Ann Watkins, in her written objection to the settlement agreement, echoes this sentiment:

> I honestly do not understand why plaintiffs receive "coupons" unless this is some marketing scheme. . . . Would you please explain to me why if [AHFC] ripped off consumers with leases, consumers would get coupons only good if they went back to [AHFC] and signed additional contracts with them?

(App. A, Obj. Mary Ann Watkins.)

In support of the settlement, the plaintiffs argue that AHFC *will* suffer substantial losses due to its liability for the coupons. The court is not persuaded. It defies reason to argue that AHFC suffers a loss every time it redeems a $75 or $150 coupon on the new sale or lease of a $15,000–$25,000 automobile. AHFC will suffer no losses from its redemption of these coupons and merely stands to benefit from them in the same way that car manufacturers benefit from the substantially larger rebates that they typically offer on the sale or lease of their automobiles.

### B. *Forgiveness of Deficiencies*

The settlement also provides for the forgiveness of either twenty-five or fifty percent of any monies owed to AHFC as a result of default or early termination fees. This differs significantly with the amended complaint which demands that AHFC forgive all deficiencies owed and return any payments made as a result of early termination/default fees charged in connection with the alleged defective leases. (*See* First Am. Compl. 77(c).) *See In re GM Trucks*, 55 F.3d at 810 (holding that "substantial concerns [about a settlement] are created by the dramatic divergence of the settlement terms from the relief originally sought").

During the final approval hearing, the plaintiffs pointed to the deficiency provision of the settlement as a substantial source of revenue for the class members. They argued that forgiveness of between twenty-five and fifty percent of the total deficiency owed could amount to a significant recovery for those class members who owed deficiencies to AHFC. They further claimed that this deficiency forgiveness would greatly harm AHFC by diminishing the monies that it could collect from deficiency payments. The court, however, is not persuaded.

The value of these deficiency credits is speculative at best. There is no evidence to show what percentage, if any, of the class members who owe a deficiency would pay this deficiency to AHFC if no credit existed. Since these individuals owe deficiencies because they have *already* failed to pay the early termination charges, there is no reason to believe that, without the credit, they would pay the deficiency. Therefore, to the extent that AHFC will redeem deficiency credits, the court has no benchmark against which to compare the amount that AHFC would collect by offering the credits. Thus, it cannot determine the detriment AHFC would suffer as a result of the credits. *See Buchet*, 845 F.Supp. at 696 (stating that without at least a guaranteed minimum cash payment, the court has no "benchmark for evaluating the proposed settlement"). Furthermore, without knowing how many of those who redeem

---

**19.** The true value of these $75–$150 coupons to AHFC can best be understood by comparing them to the $250–$1500 rebates typically offered by automobile companies in the normal course of their business. AHFC is able to achieve the same goal, *i.e.* increase its sales, by offering a fraction of the typical rebate.

the credits would not have paid the deficiency absent the existence of the credits, the court cannot evaluate the benefit accruing to the class. *See id.* at 695–96 (recognizing that the potential for an extremely low redemption rate could render the certificates worthless).

Similar to the coupons, this portion of the settlement seems to be nothing more than a sophisticated collection scheme by AHFC. *See In re GM Trucks,* 55 F.3d at 807. AHFC does what collection agencies often do in order to reduce losses and increase the amount of revenue collected from overdue debts: it offers a significant discount in the deficiency owed by class members who promptly pay their debt, and a less substantial discount to those members who eventually pay it. Presumably, this practice *benefits* AHFC because it is able to collect debts that it never could have collected in the past.[20] *See id.* at 808 (stating that "rather than providing substantial value to the class, the certificate settlement might be little more than a sales promotion").

### C. *Total Release*

■ As a result of this settlement, any class member who does not opt out relinquishes his or her right to, at some future time, bring suit in connection with all of the claims that were, or could have been, asserted in the First Amended Complaint. (*See* Joint Appl. Ex. A at 8–10.) This includes, but is not limited to, claims arising from: (1) early termination/default fee disclosures in the lease agreement; (2) warranty disclosures in the agreement; and (3) unfair trade practices arising from the lease agreement. (*Id.*)

One of the objectors claims, and the court agrees, that this release goes too far. As the court in *Buchet* noted when considering the exact same type of release, "a defendant would normally be expected to pay a premium for this type of global peace." *Id.* at 697 (internal quotation marks omitted). AHFC has paid no such premium. As stated above, the settlement that AHFC proposes to pay to the class is virtually worthless and does not merit such a substantial release.

Simply with respect to the unfair trade practices claim, neither the plaintiffs nor the defendants presented any evidence at the final hearing or in the pleadings in support of their argument that this claim is weak and therefore can be released.[21] There is not sufficient evidence in the record to conclude that this claim is weak. Further, as stated above, the standards for liability and potential damage awards vary widely from state to state, so that, depending on where a class member is from, that person may or may not have a stronger unfair trade practices claim than other class members. (*See* Pls.' Mem. App. L.)

■ In assessing a class action settlement, the court "has the fiduciary responsibility of ensuring that the settlement is fair and not a product of collusion, and that the class members' interests [are] represented adequately." *International Union of Elec., Elec., Salaried. Mach., and Furniture Workers v. Unisys Corp.,* 858 F.Supp. 1243, 1264 (E.D.N.Y.1994) (quoting *In re Warner Communications Secs. Litig.,* 798 F.2d 35, 37 (2d Cir.1986)). Absent a showing that these state law claims are frivolous and would not be successful in at least a majority of the states, the court, realizing its responsibility to the absentee class members, *see Holmes,* 706 F.2d at 1148, is unwilling to allow them to be released.[22]

### D. *Plaintiffs' Award and Attorneys' Fees*

■ The three named class representatives will share $7500 and the class attorneys

---

20. Both parties' main argument in support of this settlement is that the plaintiffs' case is weak. The court can only assume that, AHFC, based on its belief that the plaintiffs' case is weak, does *not* expect to lose any money from these deficiency coupons. *See Buchet,* 845 F.Supp. at 696 (stating that the defendant's unwillingness to establish a minimum cash payment reflects its belief that the certificates will not be redeemed at a very high rate).

21. On May 9, 1997, in conjunction with the parties' application for preliminary approval of the settlement, the plaintiffs requested, and were subsequently granted, leave to amend the complaint. Rather than relinquishing these allegedly meritless state law claims, the amended complaint *re-alleges* these claims on behalf of the class. (*See* First Am. Compl. ¶¶ 78–99.)

22. The court is not satisfied that the opt-out provision of the settlement renders the release provision fair. *See National Super Spuds, Inc. v.*

will receive $140,000. In assessing the fairness of a settlement the court must consider, *inter alia*, whether the named plaintiffs are the only class members to receive monetary relief. *See In re Dun & Bradstreet Credit Serv. Customer Litig.*, 130 F.R.D. 366 (S.D.Ohio 1990); Manual for Complex Litigation § 30.42 (3d ed.1995).

■ The named plaintiffs' receipt of $2500 each is problematic in light of the plaintiffs' representations that their case lacks merit and does not warrant a more substantial award to the class.[23] The maximum value of the early termination fee disclosure claim under the CLA, the only claim which the plaintiffs believe has any merit, is $1000. *See* 15 U.S.C. § 1640(a)(2)(A). At the final settlement hearing, the plaintiffs argued that the extra $1500 would justifiably reward the named plaintiffs for bringing this suit. As the court recognized in *In re Dun & Bradstreet*, "[n]umerous courts have not hesitated to grant incentive awards to representative plaintiffs who have been able to effect substantial relief for classes they represent." *Id.* at 373–74 (citations omitted). However, no reward is justified where, as here, the named plaintiffs have not effected any significant relief for the class members, and their representation of the interests of the individual class members has been nothing short of abysmal. Furthermore, contrary to the plaintiffs' claim that the extra $1500 compensates them for the costs of bringing this suit, there is no evidence that the named plaintiffs incurred any financial hardship or expended any significant time in bringing this suit. In fact, at the hearing, the parties admitted that none of the named plaintiffs have even been deposed for this case. *Cf. id.*, 130 F.R.D. at 374 (noting that the named plaintiffs "incurr[ed] substantial direct and indirect financial risks in attempting to vindicate the rights of others").

■ The plaintiffs claim that their case is weak and does not merit a more substantial class settlement. However, the court is skeptical of the plaintiffs' argument in light of their contradictory statement in their memorandum in support of final approval of the settlement: "The class has an excellent chance of proving a less serious violation of the CLA." (Pls.' Mem. at 9.) Nonetheless, accepting the plaintiffs' argument that its claims are weak and would probably not survive at trial, the court cannot ascertain a justification for encouraging other plaintiffs to bring similarly weak claims on behalf of a class, a suit that, according to this settlement agreement, benefits only the named plaintiffs and the attorneys.[24] As stated above, an excessive cash award to the named plaintiffs in a class action suit is only appropriate to either compensate them for the costs of litigation or motivate others to bring suit when the rights of a class of people have been violated. *See In re Dun & Bradstreet*, 130 F.R.D. at 373–74.

---

*New York Mercantile Exch.*, 660 F.2d 9, 18 (2d Cir.1981) (holding that, where there was no opt-out provision in the settlement, a release of claims other than those asserted in the complaint was not reasonable). The notice that was sent to the class members did not inform them of the potential statutory minimum awards available under both the CLA and the applicable unfair trade practices statute. Thus, class members did not know that, by failing to opt-out of the settlement, they were foregoing the potential of such awards in an individual law suit.

23. In addition to the cash award, Clement receives a full deficiency credit for all monies owed AHFC and a clean credit history as to the deficiency. (*See* Joint Appl. Ex. A at 25.) This is substantially greater than the twenty-five to fifty percent deficiency credit received by the rest of the class members. (*See id.* Ex. A at 19.) As one class member who opted out of the settlement stated, "I cannot participate in this settlement knowing that some of the class members are having their deficiencies waived and their credit repaired ... but mine is not." (App. A, Obj. Timothy MB Farrell.)

24. To the extent that the parties argue that this settlement in some way serves the public interest by deterring future CLA or other state law violations by AHFC, the court is not persuaded. Beyond AHFC's responsibility for the $140,000 in attorneys' fees and the $7500 award to the named plaintiffs, and the potential damage to its reputation that it could suffer as a result of the class settlement notice being sent to 650,000 people, AHFC is not harmed by the settlement. On the contrary, as stated above, the award to the class seems to benefit AHFC by potentially increasing the amount of car leases and purchases that it finances, and by potentially increasing the number of deficiencies collected on past due early termination fees.

The $140,000 award of attorneys' fees is likewise suspect. "The need for close review of provisions for attorneys' fees is particularly acute where settlement provides for distribution in kind to the plaintiff class in lieu of money." Manual for Complex Litigation § 30.42 (3d ed.1995). As the court pointed out in *Tornabene*, a large disparity between the attorneys' fee award and the individual class member's portion of the settlement could signal an abuse of the class action process. *See* 88 F.R.D. at 60.

There are two different methods for determining the propriety of an attorney fee award in a class action law suit: the percentage of recovery method and the lodestar method. *Compare Court Awarded Attorney's Fees, Report of the Third Circuit Task Force*, 108 F.R.D. 238, 250 (1985) (applying the percentage of recovery method to common fund cases) *with Grinnell*, 495 F.2d at 470–73 (applying the lodestar method to class action settlements). Whereas "the lodestar method calculates fees by multiplying the number of hours expended by some hourly rate appropriate for the region and for the experience of the lawyer[,]" *In re GM Trucks*, 55 F.3d at 819 n. 37, "[t]he percentage of recovery method resembles a contingent fee in that it awards counsel a variable percentage of the amount recovered for the class." *Id.* at 819 n. 38.

For the purposes of this ruling, and recognizing that, in light of the court's decertification of the settlement class, the issue of attorneys' fees is not dispositive of the settlement, the court follows the Third Circuit's decision in *In re GM Trucks*. In that case, which also involved the distribution of coupons to a class, Judge Becker stated that, although the settlement was difficult to value, "it more closely resemble[d] a common fund case[,]" and thus warranted application of the percentage of recovery method. See *id.* at

821–22 (warning that "the court must vigilantly guard against the lodestar's potential to exacerbate the misalignment of the attorneys' and the class's interests").[25] The plaintiffs claim that their fee award is a far smaller percentage of the recovery than the customary percentage approved in courts throughout the country because the harm suffered by AHFC, if it redeems even a small percentage of the coupons and deficiency credits, would be substantial. (See Pls.' Mem. at 15–16 (citing *Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 272 (9th Cir.1989) (stating that fee awards generally range between twenty and thirty percent of the total recovery) and *Bebchick v. Washington Met. Area Transit Comm'n*, 805 F.2d 396, 406–07 (D.C.Cir.1986) (holding that twenty-five percent of the recovery is a reasonable percentage fee)).) The court is not persuaded.

"The key element in assessing the reasonableness of an attorney's fee and any adjustment made in the amount requested is 'the relationship between the amount of the fee awarded and the results obtained.'" *In re Presidential Life Secs.*, 857 F.Supp. 331, 335 (S.D.N.Y.1994) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 437, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983)); *see also Selzer v. Fleisher*, 629 F.2d 809, 814 (2d Cir.1980) (stating that any attorneys' fee award "must be proportionate to the result achieved"). The $140,000 attorneys' fee award is not reasonable because no benefit accrues to the class. As this court stated above, both the coupon and the forgiveness of deficiency award are practically worthless to the individual class member. *See Voege v. Ackerman*, 70 F.R.D. 693, 695 (S.D.N.Y.1976) (stating, "The court is of the view that of substantial significance is the value of the benefit actually received by those on whose behalf the action was allegedly instituted.

---

25. Judge Becker further stated that the court could "as a check, ... use the lodestar method to assure that the precise percentage awarded does not create an unreasonable hourly fee." *In re GM Trucks*, 55 F.3d at 822; *accord In re Dun & Bradstreet*, 130 F.R.D. at 373 (stating that the lodestar figure is relevant in a common fund case); *cf. Maywalt v. Parker & Parsley Petroleum* Co., 963 F.Supp. 310, 313 (S.D.N.Y.1997) (using the percentage recovery method to check the lodestar method's result). However, based on

the pleadings, the court cannot apply the lodestar method. While the plaintiffs' attorneys argue that their fees and expenses were approximately $131,000 and submit billing records to support this claim, they fail to submit affidavits which state the average fee rate in the industry for each of the different types of services rendered. *See In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 226, 232–39 (2d Cir.1987) (setting down method for determining lodestar figure).

Here, the financial benefit to them is almost zero.").

Furthermore, the plaintiffs' argument that AHFC's substantial losses justify the fee award is illusory. AHFC would not suffer harm as a result of this settlement, but rather would *benefit* substantially from the additional cars that it would sell or lease with each coupon redeemed and the additional monies that it would collect with each deficiency that it discounted. A $140,000 attorneys' fee award in a settlement that benefits the named plaintiffs and the defendants, but *not* the individual class members, is more than just suspect. It is wholly inappropriate. Even had the court accepted this settlement based on the claimed weaknesses in the plaintiffs' case, it would have greatly decreased the amount of attorneys' fees awarded to the plaintiffs' attorneys.[26]

## CONCLUSION

For the reasons stated above, the conditional certification of the class and subclass described in the settlement agreement is REVOKED, these classes are DECERTIFIED, and this settlement agreement is hereby REJECTED.

### Appendix A

Law Office of

LYNDE SELDEN CHARTERED PLC

August 14, 1997

Daniel A. Edelman, Esq.
EDELMAN & COMBS
135 South LaSalle St., Suite 2040
Chicago, IL 60603

Mark B. Seiger, Esq.
HALLORAN & SAGE, LLP
One Goodwin Square
225 Asylum St.
Hartford, CT 06103

RE: *Clement, et al. v. American Honda Finance*

Dear Counsel:

You have got to be kidding!

You are going to get paid for this settlement? By its terms I get nothing unless I agree to enter into a new lease agreement with the defendants who already cheated me? I would rather opt out so when I negotiate the termination of my existing lease, which violates the law, I can try to get some *real* settlement benefits, like a discount from what I allegedly owe in hard cash. As far as I can tell, your deal is better for Honda than no deal at all: In theory, they stand to sell/lease additional vehicles as a result of the incentive to sign a new lease![1]

Trying to enforce your settlement across the country is an outrage. As a California resident, my rights are far stronger than, evidently, the rights of Connecticut citizens. Too bad, you did not use California law.

I hereby opt out.

Very truly yours,

/s/ Lynde Selden II

Lynde Selden II

LS/caf
cc: The Honorable Alan H. Nevas

July 25, 1997

The Honorable Alan H. Nevas
United States District Court for the
District of Connecticut
United States Courthouse
915 Lafayette Boulevard
Bridgeport, CT 06604

**SUBJECT: Civil Action 3:95 CV 00660(AHN)**

---

26. Objectors also expressed their disgust with the attorneys' fee award. For example, James Rester wrote, "This settlement is an insult. In my opinion, this type of action is a waste of time, and is only a way to generate attorney fees." (App. A, Obj. James Rester.) Harold Heslinga likewise stated, "The proposed settlement of class action is a rip-off beneficial mainly to the attorneys involved." (App. A, Obj. Harold Heslinga.)

1. No one really would decide to lease a new Honda just because they have a $75 or $150 coupon as the vehicles are so much more expensive than the coupon's value.

Dear Mr. Nevas,

By way of this letter I wish to express my disgust with the United States legal system as indicated by the proposed American Honda Finance Corporation class action settlement. I leased a vehicle from American Honda and was aware of the payment required if the lease was terminated before the agree upon time period. I purchased the vehicle I had leased, so this law suit is of no interest to me. However, this settlement is. The proposed settlement of: 1) $140,000 to the lawyers, 2) $10,000 to the Named Plaintiffs, and a pittance to everyone else is what is wrong with the current legal system. If Honda did nothing wrong, then there should not be a settlement. If Honda did someone wrong, then plaintiffs should only receive payment equal to their lost, the $400 early termination fee. The lawyers should not get $140,000 settlement for just bringing a law suit.

If you have any comments or any additional information is required, please feel free to contact me.

Sincerely,

/s/ T.R. Willequer

Thomas R. Willequer
3049 Spring Road
Carlisle, PA 17013
(717) 245–7185

LAW OFFICES
L. ROBERT LIEB
THREE GARRET MOUNTAIN PLAZA, SUITE 402
WEST PATERSON, NEW JERSEY 07424
(201) 279–9000
FAX: (201) 279–3269

July 28, 1997

Honorable Alan H. Nevas
**United States District Court for the District of Connecticut**
915 Lafayette Boulevard
Bridgeport, CT 06604

Re: Clement v. American Honda Finance Corporation

Dear Judge Nevas:

As a former practicing attorney, I read with much interest the proposed settlement agreement that was circulated in connection with the above case. By this letter, I irrevocably assign any "benefits" that would accrue to me the American Red Cross or a charity of the Court's choosing.

It would be very much appreciated if the Court could make known to the parties the absolute disgust with which a customer views the waste of the Court's time, with the only substantial benefit obviously accruing to the attorneys on either side that crafted a settlement that is of dubious benefit to anybody.

I only hope that the Court takes this into consideration in fixing the attorneys' fees, as I view a $75 coupon, to be used only in future dealings with American Honda Finance, to be virtually worthless. Since there is really no substantial economic benefit to the class, why was the litigation pursued in the first place? This is an example of the very unproductive forces that unnecessarily burden the business community, and I only hope that the Court will exercise its prerogatives and bring some reason and logical thought to bear.

Respectfully yours,

/s/ L. Robert Lieb

L. Robert Lieb

LRL:sps

 Daniel A. Edelman, Esq.
 Edelman & Combs
 135 South LaSalle Street
 Suite 2040
 Chicago, IL 60603
 American Honda Finance Corporation
 P.O. Box 22965
 Torrance, CA 90509–2295

**IRWIN GRANAT**
6970 Los Coyotes Place
Camarillo, California 93012
(805) 388–2137

July 27, 1997

The Honorable Alan H. Nevas, Judge
United States Courthouse
915 Lafayette Boulevard
Bridgeport, CT 06604

Re: Civil Action 3:95 CV 00660(AHN)

Dear Judge Nevas:

I know this isn't the standard way to communicate with the court, but I just received the information concerning the subject Civil Action and I am flabbergasted at the proposed settlement. Coupons which require buying or leasing another car from Honda at a future date which may be as long as 4 years away (as it is in our case) are practically worthless. Maybe the attorneys involved should be paid in "coupons" then there would probably be a more reasonable settlement.

If the coupons could be redeemed for Honda merchandise or used as cash to make lease payments the settlement would be equitable. After all, Honda did violate Federal, State, and local laws.

Thank you for taking the time to read this.

Sincerely,

/s/ Irwin Granat

July 24, 1997

Daniel Edelman, Edelman & Combs
135 South LaSalle St.
Ste.2040
Chicago,IL 60603

Dear Sirs:

I have just received one of your letters regarding the "Class action suit vs. AHFC."

I honestly do not understand why plaintiffs receive "coupons" unless this is some marketing scheme. For example, with class action suits vs. silicone breast implants, plaintiffs are not entitled to coupons for additional plastic surgery, nor do cigarette plaintiffs receive coupons for more tobacco products or for medical care.

Would you please explain to me why if American Honda Finance Corporation ripped off consumers with leases, consumers would get coupons only if they went back to American Honda Finance Corporation and signed additional contracts with them?

If this is legitimate, it would appear the law firm makes money and AHFC makes money and the consumer commits more money.

I did have a lease with AHFC. The entire experience was so poor, I bought the car out early to end the lease and swore I would NEVER, EVER, if at all possible enter into any lease agreement again. So far I am keeping to that plan.

This entire episode feels like a marketing scheme to me, with the facts being improperly presented. I am sending copies of this letter to the U.S. Postal Inspector to see if mail fraud is being perpetrated.

Thank You.

Sincerely yours,

/s/ Mary Ann Watkins

Mary Ann Watkins
8130 West Old Nashville Rd.
Columbus, IN 47201

*P.S. You are not entitled to my ssn either.*

**TIMOTHY MB FARRELL
PPP 652 BOX 10000
SAIPAN MP 96950
TELEPHONE: (670)235–7118**

August 13, 1997

Daniel Edelman
Edelman & Combs
135 LaSalle St. No. 2040
Chicago, IL 60603

Re: Class Action Against Honda, civil action 3:95 CV 00660(AHN)

Dear Mr. Edelman:

I applaud you for your efforts to enforce the law against Honda. When I attempted to read my lease, the folks at Acura's finance department discouraged me, assuring me that every provision had been litigated and found to be proper. An unbelievable assertion for a lease as egregious as this one.

Although I have submitted a claim form, I can not participate in this settlement knowing that some of the class action members are having their deficiencies waived and their credit repaired with the agencies (TRW, Equifax and Trans Union), but mine is not. If this lease is invalid, then why should my credit suffer? If you can get this lease taken

off my credit history, then I will join your class.

You should be able to get rid of all bad credit reports as a result of this lease. For one thing, it will cost Honda nothing. For another, if I am to join this class, then it is only fair to give me the same nominal benefits that my cohorts are getting. Finally, my credit should not be made to suffer due to Honda's bad acts.

Sincerely,

/s/ Timothy MB Farrell

Timothy MB Farrell
Attorney at Law

Honda
PO Box 2295
Torrance, CA 90509–2295
Clerk, U.S. District Court
915 Lafeyette Blvd.
Bridgeport, CT 06604

Sandestin Resorts, Inc.

9300 Highway 98 West

Destin, FL 32541

July 25, 1997

Mr. Daniel A. Edelman
EDELMAN & COMBS
135 South LaSalle St., Ste. 2040
Chicago, IL 60603

RE: CLASS ACTION SUIT

AMERICAN HONDA FINANCE CORP.

Dear Mr. Edelman:

I strongly object this whole matter. This settlement is an insult.

In my opinion, this type of action is a waste of time, and is only a way to generate attorney fees. Please remove me from any further mailings concerning this suit.

Very truly yours,

/s/ James M. Rester

James M. Rester
JMR/sdj

LAW OFFICES
HESLINGA, HELSINGA, DIXON & SMITH
118 NORTH MARKET STREET
OSKALOOSA, IOWA
52577

July 28, 1997

The Honorable Alan H. Nevas
United States District Court
District of Connecticut
915 Lafayette Blvd.
Bridgeport, Connecticut 06604

RE: Civil Action
3:95 CV 00660 (AHN)
Clements v. Am. Honda Finance Corp.

Dear Judge Nevas:

The proposed settlement of class action is a rip-off beneficial mainly to the attorneys involved.

As a claimant, I want no part of the parody.

Yours very truly,
/s/ Harold B. Heslinga
Harold B. Heslinga

HBH/jd