Gants, Ralph D., J.
The plaintiffs in this action are a certified class of consumers residing in Massachusetts who indirectly purchased from the defendants United States Tobacco Company and its affiliates (collectively, “UST’) for their own use moist snuff tobacco products, more commonly referred to as smokeless tobacco, between January 1, 1990 and the present. USTs oldest and most well known brands of smokeless tobacco are Copenhagen and Skoal. According to the plaintiffs’ Amended Complaint, UST, which controlled 70 percent of the United States market for smokeless tobacco, engaged in various allegedly unfair acts and practices to consolidate and extend its near-monopoly position, including entering into agreements with retailers to exclude competitors’ smokeless tobacco from its sales racks and encouraging them not to sell or display competitors’ brands. This class action is one of many in various states around the nation that “piggy-backed” on a federal antitrust action brought by Conwood Company, L.P. (“Conwood”), a UST competitor which entered the smokeless tobacco market in the 1970s. In March 2002, following ajuiy trial in February 2000, Conwood obtained a $1.05 billion judgment ($350 million in compensatory damages, trebled to $1.05 billion) against UST for violations of section 2 of the Sherman Act. The judgment was later affirmed by the Sixth Circuit of the United States Court of Appeals. Conwood v. UST Co., 290 F.3d 768 (6th Cir. 2002), cert. denied, 537 U.S. 1148 (2003).
After various rounds of mediation, the parties on January 31, 2008 entered into a Settlement Agreement which all parties now ask this Court preliminarily to approve.[1] After hearing, the parties’ joint motion for preliminary approval of the Settlement Agreement is DENIED.
The Proposed Settlement Agreement
Under the proposed Settlement Agreement, once class members are given notice of the Court’s preliminary approval of the proposed settlement, they have one year to submit a Claim Form to UST seeking one of two kinds of Coupon Packages — either a “3-Can Coupon Package,” which will give them $6 off the purchase of three cans of UST smokeless tobacco, or a “Single Can Coupon Package,” which will give them $1.50 off the purchase of a single can of UST smokeless tobacco. No documentation, such as sales receipts, is required to corroborate that the person submitting the Claim Form truly is a member of the plaintiff class. All that is needed is for the class member to attest that he or she purchased UST smokeless tobacco during the class period and was of legal age to do so at the time of purchase. The coupons may not be used to purchase any other product other than UST smokeless tobacco, and may not be redeemed for cash by any member of the class; only the tobacco retailer may redeem the coupons for cash after they are used to purchase UST smokeless tobacco.[2] The coupons may not be stacked, that is, they may not be used with each other or with other coupons, so the maximum discount is $6 for a “3-can” or $1.50 for a single can. The coupons may be used to purchase UST smokeless tobacco at a discounted price for 20 years, and are freely transferable to others.
Under the Settlement Agreement, UST commits to providing coupons with a face value not exceeding $14,328,000. Since it estimates that there are 14,983 members of the class in Massachusetts, based on a survey of smokeless tobacco users, UST is prepared to provide each member of the class who files a Claim Form coupons with a face value of $960.[3] In the unlikely event that more than 14,925 persons submit valid Claim Forms, the coupon program will be first come, first served, since UST has not committed to *720 providing more than $ 14,328,000 in coupons. If at the close of the one-year sign-up period less than 40 percent of the face value of the coupons has been distributed (that is, less than $5,731,200), then UST within six months will distribute one-half of the coupons under 40 percent to those who filed Claim Forms as Supplemental Coupons and the other half to UST smokeless tobacco retailers, who may úse them as instantly redeemable in-store coupons. In other words, if for example only $4,731,200 in coupons have been claimed at the end of the one-year sign-up period, UST will distribute another $1 million in coupons within six months — half to those who already sent in claims and half to retailers. As a result, regardless of the number of claims, UST has committed to distribute no less than $5,731,200 in coupons.
The Settlement Agreement provides that UST, upon preliminary approval of the settlement, will escrow $3,582,000 to pay the attorneys fees for the plaintiff class. While any award of attorneys fees must be approved by this Court, UST agrees not to oppose any application for attorneys fees that does not exceed this amount. The payment of attorneys fees by UST does not reduce the coupon value of the settlement. UST is also bearing the administrative costs incurred with the coupon plan, and has agreed to pay $5,000 to each of the four named individual plaintiffs.
Apart from the coupons, the payment of fees to the plaintiffs’ attorneys, and a cash award to the named plaintiffs, UST also agrees in the Settlement Agreement that, through August 31, 2009, it will not “eliminate, remove or deface any competitor’s wholesale smokeless tobacco products, vending systems, counter displays or other advertising” except with the written consent of the relevant competitor, or induce any person to engage in this misconduct. Settlement Agreement at §2.3.
The Standard of Review for Preliminary Approval
A class action in Massachusetts, including but not limited to a class action bringing claims under Chapter 93A, may not be settled without the final approval of the court, and notice of any proposed settlement must be provided to all members of the class. Mass.RCiv.P. 23(c); G.L.c. 93A, §9. In determining whether a settlement deserves final approval, the court must, determine whether the settlement is “fair, reasonable and adequate.” Sniffin v. Prudential Ins. Co. of America, 395 Mass. 415, 421 (1985), quoting Armstrong v. Board of School Directors of Milwaukee, 616 F.2d 305, 313 (7th Cir.1980).
There appears to be no controlling Massachusetts authority setting the appropriate standard for preliminary approval of a settlement. This Court understands that the standard for preliminary approval is less stringent than for final approval, because preliminary approval means simply that notice of the proposed settlement will be sent to class members, who will then be given a chance to be heard at the hearing regarding final approval. At the same time, precisely because notice of the preliminary approval must be given to the class, which generally entails considerable expense, preliminary approval should not be an empty ritual. Pragmatically, since by definition the proposed settlement has already been agreed to by the class representatives, the attorneys for the class, and the defendants, all of whom presumably endorse the proposed settlement, the only practical consequence of the final approval hearing is that class members who may oppose the settlement agreement have an opportunity to be heard. Therefore, it makes little sense to grant preliminary approval of a settlement agreement if the court, having already heard from those who negotiated and support the settlement, fully intends to deny final approval at the final approval hearing, since all that preliminary approval will do in that circumstance is cause needless expense (in giving notice of the hearing), confusion to the class (in trying to understand what happened at the hearing to cause the court that granted preliminary approval to deny final approval), and delay (in negotiating a revised, more acceptable settlement agreement).
To be sure, preliminary approval does not require the court to have come to a final conclusion as to whether the proposed settlement is fair, reasonable, and adequate, since the court may be persuaded by dissenting class members at the hearing that the settlement agreement is not fair. Yet, it would needlessly add expense, confusion, and delay for a court to grant preliminary approval to a settlement agreement if the court intends to deny final approval even if no dissenting class member appears at the final settlement hearing. Therefore, preliminary approval of the settlement agreement should be denied if the court does not believe it possible that it would grant final approval to that settlement without further revision. See In re Prudential Sec. Litig., 163 F.R.D. 345, 355 (E.D.N.Y. 2006) (declaring the test for preliminary approval as whether the proposed settlement “appears to fall within the range of possible approval”).
The expense, confusion, and delay that would arise here if preliminary approval were provided to a settlement that ultimately will be denied final approval are especially great as a result of the terms of the Settlement Agreement. Under the proposed Settlement Agreement, the deadline for class members to file a Notice of Claim commences upon the grant of preliminary approval of the Settlement Agreement, so the Notice of Proposed Settlement invites class members, unless they intend to object to the proposed settlement, to submit a Claim Form to the Claims Administrator for Coupon Packages. If the settlement that received preliminary approval did not receive final approval, those class members who had submitted a claim for coupons would need to be informed that the court had denied final approval and told of the present status of the litigation, or else they will be waiting in vain to receive their promised coupons. Therefore, in this case, preliminary approval not only would produce the typical expectation among class members that final *721 approval would be forthcoming, but would also set in motion the procedure to claim smokeless tobacco coupons, which would only strengthen class members’ expectation of final approval (since they could justly wonder why a court would set “this train in motion” if it was only going to order it to be “returned to the station”).
The Recognized Need for Greater Scrutiny of Coupon Settlements
Various federal courts and legal commentators have recognized that coupon settlements pose special issues that require courts to use greater care in evaluating such settlements. See, e.g., In re General Motors Corp. Pick-up Truck Fuel Tank Products Liability Litigation, 55 F.3d 768, 806-07 (3d Cir. 1995) (finding that District Court erred in approving class settlement in which the owners of General Motors trucks with defective fuel tanks were given coupons worth $1,000 towards the purchase of a new General Motors truck); Synfuel Tech. Inc. v. DHL Express, Inc., 463 F.3d 646, 654 (7th Cir. 2006) (rejecting class action settlement offering pre-paid Letter Express packages to settle allegations of unlawful overcharges); Clement v. American Honda Fin. Corp., 176 F.R.D. 15, 29 (D.Conn. 1997) (rejecting class action settlement proving coupons for $75 or $100 off future Honda leases for alleged violations of Consumer Leasing Act); Nancy Morawetz, Bargaining, Class Representation, and Fairness, 54 Ohio St.L.J. 1, 13-20 (1993); Christopher Leslie, The Need to Study Coupon Settlements in Class Action Litigation, 18 Geo.J.Legal Ethics 1395 (2005).
Among the concerns raised with such coupon settlements are:
1. The actual value of the settlement to the class is generally far less than the face value of the settlement, because many, perhaps, most of the class will not make use of the coupons. See Buchet v. ITT Consumer Financial Corp., 845 F.Sup. 684, 692, 694 (D.Minn. 1994) (rejecting settlement as “simply too tenuous and speculative in nature” where expert estimated 50 percent of settlement class would not be able to use coupon).
2. The only way to make use of the coupons is to buy products from the same company that committed the wrongdoing. A consumer who no longer wishes to purchase the products made by the defendant (or who no longer wishes to purchase this type of product made by any manufacturer) receives no benefit from the settlement. Since the consumer will receive a discount only if he purchases the defendant’s products, such settlements serve to promote class members’ loyalty to the brands made by the veiy company that allegedly did the class wrong and ultimately strengthens the defendants’ market position. See Morawetz, 54 OhioSt.L.J. at 15.
3. The benefits of some coupon settlements are illusory for the class if the defendant is already making these coupons or comparable discounts available wholly apart from the class settlement, and the class action settlement coupons cannot be stacked with these other coupons or comparable discounts. See Clement, 176 F.R.D. at 28 n.19 (rejecting coupon settlement as nothing more than a sophisticated marketing program where coupons offered were less than rebates typically offered in normal course of business).
These concerns were sufficient to cause the United States Congress to require federal judges considering class action coupon settlements in federal class actions to make written findings that such coupon settlements are fair, reasonable, and adequate for class members before approving such a settlement. Class Action Fairness Act of 2005, 28 U.S.C. §1712(e) (“In a proposed settlement under which class members would be awarded coupons, the court may approve the proposed settlement only after a hearing to determine whether, and making a written finding that, the settlement is fair, reasonable and adequate for class members”). While this federal statute does not govern state court consideration of class action settlements, the passage of this provision reflects how “mainstream” the concern with coupon settlements has become.
Analysis of the Proposed Coupon Settlement
Each of these three concerns is present to an abundant degree with the coupon settlement proposed here:
1. While the face value of the coupon settlement to the class is potentially $14,328,000, its actual value to the class is closer to $2,579,040. USTs attorney has represented to this Court that, based on USTs considerable past experience in other states with these coupon settlements, it anticipates that only 40 percent of the coupons will actually be claimed, and that only 50 percent of the claimed coupons will actually be used. If past is prologue here in Massachusetts, then, the face value of the coupons that will be claimed will be roughly $5,731,200, and the actual cost to UST to redeem these coupons from retailers will be $2,865,600. In fact, the present value of the actual cost is even less than $2,865,600, because these coupons may be used over 20 yeans and a significant share of these coupons will not be used in the first year, meaning that the total cost should be discounted to recognize that UST will have use of much of this money in the first few years after the settlement and should reduce its cost by the appropriate discount rate. For purposes of this decision, this Court will assume a rather modest total discount of only 10 percent, which would reduce its present value to the class to roughly $2,579,040.
2. Under the terms of the proposed settlement, the coupons may be used only to purchase UST smokeless tobacco products, not any other product sold by UST (which sells various wines) nor any smokeless tobacco product sold by any other company. Therefore, ironically, the proposed settlement of a case *722 premised on USTs unfair practices in causing retailers not to display smokeless tobacco made by USTs competitors will be of value to USTs former smokeless tobacco customers only if they purchase UST smokeless tobacco, and will be worthless to those who prefer the smokeless tobacco made by a UST competitor or who have stopped using smokeless tobacco.
3. UST, through a wholly-owned subsidiary (BABCO Associates, Ltd.), publishes six bimonthly issues per year of a magazine named Heartland USA, which describes itself as the magazine of the “American Outdoor Lifestyle.” While an annual subscription to Heartland USA costs $22, UST will provide a free subscription to adult consumers who sign up to receive mailings from UST. Each issue of Heartland USA published in 2007 contained one or two coupons providing a discount off a future purchase of a specified number of cans of Copenhagen or Skoal. If an issue contained two coupons, typically one would be for a single-can purchase and the other for a multiple-can purchase. Apparently, different issues of Heartland USA are sent to subscribers who indicate different brand preferences and rates of purchase, because the coupons in different issues vary in value. For instance, in the Januaiy/Februaiy 2007 issue, the coupons ranged in value from $1 to $2.50 off a single can, $2 to $4 off a five-can purchase, and $4 to $8 off a ten-can purchase. Over the course of2007, a Heartland USA subscriber who claimed to be a regular user of one of USTs premium smokeless tobacco brands received coupons worth $63.55 over the course of the year, assuming he clipped a coupon for a single-can purchase and for a ten-can purchase each issue. If UST were to continue these coupon promotions at the current rate over 20 years, a subscriber could receive as much as $1,271 in coupons during this time period, which is greater than the $960 coupons he would receive from the proposed class action settlement. Since retailers are instructed to accept only one coupon per purchase, the class action coupons may not be stacked with the Heartland USA coupons.[4]
To be sure, the availability of these Heartland USA coupons does not mean that a regular smokeless tobacco user can clip from that bimonthly magazine as many coupons as he may need over two months. Since a regular smokeless tobacco user may purchase three to four cans per week (or roughly 27 to 36 cans per month), he may use up the Heartland USA coupons before the end of the first month and then use the class action coupons until he receives the next issue of Heartland USA. The availability of these coupons, however, may reduce the value of the class settlement to a less frequent user of smokeless tobacco, who may be able to get through the two months using just the Heartland USA coupons. More importantly, the availability of these coupons through Heartland USA demonstrates that UST, for its own marketing purposes and without the need to settle class action litigation, is willing to make available to its customers coupons of a value comparable to those offered to settle this litigation.
In this case, apart from these three concerns, there is a fourth not often found in class action coupon settlements — whether the proposed settlement is consistent with the public interest. In appropriate circumstances, a court may consider whether the proposed class action settlement is consistent with the public interest. See Angela R. by Hesselbein v. Clinton, 999 F.2d 320, 324 (8th Cir. 1993) (before approving class action settlement, judge must determine that settlement “fairly and reasonably resolves the controversy in a manner consistent with the public interest”); Bailey v. Great Lakes Canning, Inc., 908 F.2d 38, 42 (6th Cir. 1990) (court may approve class action settlement only after determining that settlement is fair, adequate, and reasonable, as well as consistent with public interest); Bass v. Federal Sav. & Loan Ins. Corp., 698 F.2d 328, 330 (7th Cir. 1983) (court must “satisfy itself that the settlement was equitable and in the public interest”). The proposed settlement is of greatest value to those who smoke a great amount of UST smokeless tobacco, and of no value to those who quit smokeless tobacco. The proposed settlement affirmatively encourages the continued use of smokeless tobacco, both because it reduces the net price of smokeless tobacco to class members and because it allows class members to benefit from the class action only by continuing to consume UST smokeless tobacco products. Yet, smokeless tobacco is a product that, by act of Congress, may only be sold with one of the following warnings (rotated quarterly): ‘WARNING; THIS PRODUCT MAY CAUSE MOUTH CANCER”; ‘WARNING: THIS PRODUCT MAY CAUSE GUM DISEASE AND TOOTH LOSS”; and “WARNING: THIS PRODUCT IS NOT A SAFE ALTERNATIVE TO CIGARETTES.” Comprehensive Smokeless Tobacco Health Education Act, 15 U.S.C. §4402 (2008); FTC Regulations Under the Comprehensive Smokeless Tobacco Health Education Act of 1986, 16 C.F.R. §307 (2008). In short, smokeless tobacco is a product so dangerous to human health that the Congress permits it to be sold only when the consumer is warned of the substantial risk to his health he is taking by using it. Indeed, the Surgeon General of the United States has found that smokeless tobacco is known to cause human cancer by increasing the risk of developing cancer of the mouth, and can cause other oral health problems, such as leukoplakia (a lesion of the soft tissue that consists of a white patch or plaque) and recession of the gums. See U.S. Department of Health and Human Services, Preventing Tobacco Use Among Young People: A Report of the Surgeon General, July 1994, found at http://www.cdc.gov/tobacco/data_statistics/sgr/sgr _1994/index.htm. Consequently, this proposed settlement will encourage class members to continue to use and even increase their use of a product that poses a significant danger to their health.
*723 When this Court considers together each of these four concerns, it is plain to this Court that the proposed settlement, as currently crafted, is not fair, adequate, reasonable, or consistent with the public interest. When one strips this proposed coupon settlement to its essence, it is little more than a $2.58 million marketing program that will benefit class members only if they continue to use UST smokeless tobacco products, whose continued use will significantly increase their risk of mouth cancer or gum disease. The named individual plaintiffs, in contrast, would each receive $5,000 under the proposed settlement; the plaintiffs’ attorneys would receive up to $3.582 million.
The plaintiffs and UST justly observe that coupon settlements less generous than this have been approved by judges in similar litigation brought against UST in Wisconsin, Kansas, and New York, and that this settlement arose from arms-length negotiations by experienced counsel after discovery and mediation conducted by former judges. They also note that the Supreme Judicial Court has written that:
[T]he essence of a settlement is compromise . . . Because settlement of a class action, like settlement of any litigation, is basically a bargained exchange between the litigants, the judiciary’s role is properly limited to the minimum necessary to protect the interests of the class and the public. Judges should not substitute their own judgment as to optimal settlement terms for the judgment of the litigants and their counsel.
Sniffin v. Prudential Ins. Co. of America, 395 Mass. at 421, quoting Armstrong v. Board of School Directors of Milwaukee, 616 F.2d 305, 315 (7th Cir. 1980).
This judge well recognizes the limited role of the court in approving class action settlements. Indeed, in more than ten years on the bench, this is the first proposed class action settlement I have failed to approve. This Court also respects the fact that three judges in other states saw the matter differently, and were willing to approve comparable settlements in these actions. Yet, this Court also knows that, if the plaintiffs were to prevail at trial, they would receive dollars, not UST coupons, which would obviate each of the four concerns with this settlement. This Court also knows that a quite different class action settlement in essentially the same action was negotiated in California by UST and the same plaintiff law firms, which provided for a cash settlement rather than a coupon settlement. Settlement Agreement, Smokeless Tobacco Cases I-IV, J.C.C.P. Nos. 4250, 4258, 4259 and 4262 (Superior Ct., County of San Francisco, Cal.). Under the terms of the California class action settlement, which was approved by the court on March 12, 2008, class members who filed claims attesting to their use of UST smokeless tobacco products between January 1, 1990 and October 17, 2007 would likely receive $585 in cash.[5] A comparable cash settlement in this action (or one that gave claimants the choice of cash or coupons) would obviate the concerns that cause this Court not to approve the coupon-only settlement proposed here.
ORDER
For the reasons stated above, this Court DENIES the Joint Motion for Preliminary Approval of the Proposed Class Action Settlement. The denial is without prejudice; the parties are invited again to seek the Court’s preliminary approval after renegotiating the terms of the proposed settlement agreement.

This Court, sua sponte, invited the Massachusetts Attorney General to move to intervene in this action and be heard regarding the proposed settlement. The Attorney General chose instead to file an amicus curiae brief regarding the proposed settlement, which has greatly assisted this Court in its consideration of the motion for preliminary approval.

While UST will only redeem coupons for cash obtained from retailers, nothing bars class members from selling their coupons for cash on eBay or comparable informal markets, since the coupons may be transferred to other persons.

The Settlement Agreement’s math does not add up. If one divides $14,328,000 by $960, one gets 14,925, not 14,983.

UST also offered some on-line coupons but far less frequently and of far lower value. From October 7, 2007 through the end of the year, UST offered an on-line coupon good for a discount of $2.75 off a single-can purchase of Cope, a sub-brand of Copenhagen. From September 14, 2007 through the end of the year, UST offered an on-line coupon good for a discount of $0.50 off a single-can purchase of Red Seal, a non-premium UST brand of smokeless tobacco, or $2.50 off a five-can purchase. Only 16 Massachusetts residents took advantage of the Cope offer, and only one printed the Red Seal offer.

Under this settlement, a claimant would receive $195 if he attested to purchasing 30 or more cans of UST smokeless tobacco from January 1, 1990 to December 31, 1995, or from January 1, 1996 to December 31, 2001, or from January 1, 2002 to October 17, 2002. He would receive $585 only if he attested to purchasing 30 or more cans in each of these five-year time periods. If the number of claimants or award of attorneys fees is more than anticipated (since attorneys fees come out of the $96,000,000 principal amount of the settlement), the pro-rata payment may be reduced.